UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF JIMMY MILLER | Case No.  1:22 MJ 4201<br><br>**Filed Under Seal** |

**AFFIDAVIT**
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligation to Canada.

2. There is an extradition treaty in force between the United States and the Government of Canada: Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, *as amended by* Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. Treaty Doc. No. 101-17 (1990); *and* Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. Treaty Doc. No. 107-11 (2002) (collectively the "Treaty").

3. Pursuant to the Treaty, the Government of Canada has submitted a formal request through diplomatic channels for the extradition of Jimmy MILLER ("MILLER").

4. According to the information provided by the Government of Canada, MILLER was charged with one (1) count of sexual assault with a weapon, contrary to section 272(1)(a) of the Criminal Code of Canada ("CCC"); three (3) counts of sexual assault, contrary to section 271 of the CCC; four (4) counts of sexual interference, contrary to section 151 of the CCC; one (1) count of uttering a threat to cause death, contrary to section 264.l (l)(a) of the CCC; two (2) counts of invitation to sexual touching, contrary to section 152 of the CCC; and one (1) count of using an

imitation firearm while committing an indictable offence, contrary to section 85(2) of the CCC.[1]

5.  These offenses were committed within the jurisdiction of Canada. A warrant for MILLER's arrest was issued on August 13, 2021, by Justice of the Peace Louis Bourgon of the Ontario Court of Justice, Oshawa, Ontario, Canada.

6.  The extradition request presents the following facts as the basis for Canada's charges and arrest warrant:

    a. M.A. (born in May 2011) and G.A. (born in January 2017) are MILLER's maternal half-brothers. A.A. is the mother of M.A., G.A., and MILLER. During the relevant time period, between March 31, 2021, and August 8, 2021, M.A. was nine (9) and ten (10) years old, G.A. was four (4) years old, and MILLER (born November 2000) was twenty (20) years old.

    b. On August 9, 2021, A.A. and the victims' father, E.A., filed an initial police report alleging that MILLER had touched himself next to M.A. and had sexually assaulted G.A. The Detective Constable with the Durham Regional Police Service who has primary responsibility for investigating this case conducted an interview with A.A. on August 10, 2021, and A.A. provided the following information.

    c. According to A.A., on August 7, 2021, M.A. went to the movies with MILLER and afterward reported to A.A. that MILLER made him uncomfortable at the movies by talking about his "balls" hurting. After further questioning by A.A., M.A. told A.A. that MILLER had been touching himself while naked and under the blankets in bed, while

---

[1] Canada also charged, and requested MILLER's extradition on, two (2) counts of possession of a weapon for the purpose of committing an offence, contrary to section 88(1) of the CCC. However, the United States is not forwarding these two charges for weapons possession to the court for consideration.

M.A. was lying next to him.

d. Later that day, A.A. and A.A.'s daughter, S.A., confronted MILLER regarding the allegations M.A. had made against MILLER. MILLER denied the accusation, and A.A. demanded he leave the family home. MILLER packed some belongings and left the home. According to A.A., MILLER told S.A. two days later, on August 9, 2021, that he was not going to the music studio where he records music, and was instead going to get employment insurance and going where nobody would find him.

e. On August 8, 2021, A.A. asked G.A. if MILLER had ever touched him inappropriately in his "bila," which is the term they use to refer to his penis. G.A. said "yes," pulled out his penis, and showed A.A. how MILLER would touch it. G.A. also told her that MILLER put his finger and his tongue in G.A.'s "bum." G.A. said this occurred close to ten times.

f. According to A.A., she further questioned M.A. during the early morning hours of August 10, 2021, and M.A. denied that any further abuse had happened. When A.A. subsequently spoke to G.A., G.A. told A.A. that M.A. had put his "bila" (penis) in G.A.'s "bum." After G.A.'s disclosure, M.A. told A.A. that MILLER would make him and G.A. play with each other's penises, and that M.A. had put his penis in G.A.'s anus. M.A. said that MILLER watched this occur. M.A. also told A.A. that MILLER would hold a knife to M.A.'s neck and would hold G.A. down and force himself on G.A., and that MILLER also did that to M.A. M.A. also said that MILLER would threaten him and his brother, telling them that if they did not do what he demanded, then he would kill them or their dad or mom, destroy the family, and burn down the house. M.A. told A.A. that he did not previously disclose the incidents to her because of these threats.

g.     On August 10, 2021, the Canadian Detective Constable responsible for this case also interviewed M.A. and G.A., who provided the following information.

h.     M.A. said there was an incident where he was in bed with MILLER, and while he was trying to sleep, MILLER was "playing with himself" in the bed beside him. M.A. told law enforcement that MILLER threatened to kill him and his brother if they told anyone about the incidents or if they did not do what he wanted. M.A. further stated that MILLER held a knife to his neck.

i.     M.A. said the first incident occurred one month after moving into their new house. A.A. told police that the family moved into their new house on March 31, 2021. According to M.A., MILLER had a knife and asked if he could play with M.A., which meant that MILLER wanted to touch M.A.'s private parts. M.A. said that MILLER touched his penis initially over his clothes and then under his clothes. MILLER pulled M.A.'s pants down and told him to stand up and turn around. M.A. said that MILLER then put his penis in M.A.'s anus. M.A. said that MILLER threatened, "don't tell mom or I'll kill you." M.A. said MILLER held a knife to M.A.'s neck while this assault occurred. M.A. said he was very scared. M.A. said that after this incident, his "tummy" and "bum" hurt, and the next day, when he went to "poo" he saw blood.

j.     M.A. said that after the first incident, MILLER assaulted him again approximately two days later. M.A. said that MILLER assaulted him approximately 6-7 times, by touching M.A.'s penis and then proceed to penetrate M.A.'s anus with his penis. M.A. said he believed the last assault occurred approximately one month before his interview with Canadian authorities.

k.     M.A. said that, on the same day MILLER first assaulted him, M.A. went up to the

third floor of the family's home and saw MILLER playing with G.A.'s "front private." He heard MILLER tell G.A. to stand up, and he saw MILLER put his penis in G.A.'s anus. M.A. said he also heard MILLER tell G.A. not to tell their mom what had happened. M.A. told law enforcement that he did not think MILLER or G.A. knew he had witnessed the incident.

l. After M.A. finished his interview with Canadian authorities, A.A. told the interviewing officer that M.A. informed her during a short break that he did not disclose all of the incidents in his interview because he had been embarrassed and was afraid of getting into trouble.

m. During a second interview with law enforcement, M.A. said that on the day MILLER first assaulted him, MILLER did see M.A. come up the stairs when MILLER was assaulting G.A. When MILLER saw M.A. come up the stairs, MILLER pointed a BB gun at him and forced him to touch G.A.'s penis. M.A. said that MILLER also forced G.A. to touch M.A.'s penis. M.A. said that MILLER then forced M.A. to put his penis in G.A.'s anus, and that MILLER held the BB gun to the back of his head throughout this incident. M.A. told the interviewing officer that he did not disclose this incident during the first interview because he felt uncomfortable.

n. In a separate interview, G.A. told Canadian law enforcement that MILLER had touched his "abuda." G.A. pointed to his groin as he said that. G.A. told police that there was an incident that happened in his dad's bed where he was laying down and MILLER used his hand to touch him. M.A. was also present along with his dad, who was sleeping in the bed.

    o.    Anal swabs were collected from both M.A. and G.A. on August 10, 2021. Both swabs yielded only the DNA of the person from whom they were collected.

    p.    According to the extradition request, U.S. Customs and Border Protection confirmed to Canadian authorities that MILLER fled Canada the same day that his mother and half-brothers provided interviews to Canadian authorities. According to U.S. Customs and Border Protection, MILLER entered the United States at 10:44 a.m. on August 10, 2021, alone and as a pedestrian.

    q.    The extradition request contains a copy of the photograph on MILLER's Canadian driver's license, which was obtained by Canadian law enforcement from the Ontario Ministry of Transportation. A.A. later confirmed to Canadian authorities by email that this same photograph depicted her son, Jimmy MILLER.

7.    According to information received from the United States Marshal's Service, MILLER is expected to be found within the jurisdiction of this Court in Independence, Ohio.

8.    Tom Heinemann, an attorney in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty. The declaration states that the offenses for which extradition is sought are provided for by the Treaty and confirms that the documents supporting the request for extradition are properly certified by the principal U.S. diplomatic or consular officer in Canada, in accordance with 18 U.S.C. § 3190, so as to enable them to be received into evidence.

9.    The declaration from the U.S. Department of State with its attachments, including copies of the diplomatic note from Canada, a copy of the Treaty, and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit #1) are filed with this

complaint and incorporated by reference herein.

10. MILLER would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Canada, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

_Margaret Kane_
Margaret Kane
Assistant United States Attorney

Sworn to via telephone after submission by reliable electronic means.
Fed. R. Crim. P. 4.1 and 41(d)(3). This 28th day of June 2022.

HONORABLE JONATHAN D. GREENBERG
UNITED STATES MAGISTRATE JUDGE



7