DECLARATION OF TOM HEINEMANN

1:22 MJ 4201

I, Tom Heinemann, hereby declare and say as follows:

1.  I am an Attorney-Adviser in the Office of the Legal Adviser, Department of State,
    Washington, D.C. This office has responsibility for extradition requests within the
    Department of State, and I am charged with the extradition case of Jimmy Miller. I make the
    following statements based upon my personal knowledge and upon information made
    available to me in the performance of my official duties.

2.  The relevant and applicable treaty provisions in full force and effect between the United
    States and Canada are found in the Treaty on Extradition Between the United States of
    America and Canada of December 3, 1971, which entered into force on March 22, 1976 (the
    "1971 Treaty"), the Protocol Amending the Treaty on Extradition Between the United States
    of America and Canada of January 11, 1988, which entered into force on November 26, 1991
    (the "1988 Protocol"), and the Second Protocol Amending the Treaty on Extradition Between
    the Government of the United States of America and the Government of Canada of January
    12, 2001, which entered into force on April 30, 2003 (the "2001 Protocol"). Copies of the
    Treaty and Protocols are attached to this declaration.

3.  In accordance with the provisions of the Treaty and Protocols, the Embassy of Canada has
    submitted Diplomatic Note No. WSHDC-10678, dated June 9, 2022, formally requesting the
    extradition of Jimmy Miller. A copy of the Diplomatic Note is attached to this declaration.

4.  In accordance with Article 17 of the 1971 Treaty, the Government of the United States
    provides legal representation in its courts for Canada in its extradition requests, and Canada
    provides legal representation in its courts for extradition requests made by the United States.

5.  The offences of sexual assault with a weapon, sexual assault, sexual interference, utter threat
    to cause death, invitation to sexual touching, and use of an imitation firearm while
    committing an indictable offence, are extraditable offenses pursuant to Article 2 of the 1971

GOVERNMENT
EXHIBIT

1

**MILLER_Ext_0001**

Treaty, as replaced by Article I of the 1988 Protocol.  The offence of possession of a weapon for the purpose of committing an offence is not referred to the court for consideration.

6.   The documents submitted by the Government of Canada in support of its extradition request were certified on June 8, 2022, by David L. Cohen Ambassador of the United States of America in Ottawa, in accordance with Title 18, United States Code, Section 3190. Mr. Cohen, at the time of his certification, was the principal diplomatic officer of the United States in Canada.


I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed in Santa Fe, New Mexico on June 21st, 2022.




Tom Heinemann

Attorney Adviser

Law Enforcement and Intelligence


Attachments:

1.   Copy of the Note
2.   Copy of the Treaty and Protocols



Embassy of Canada      Ambassade du Canada

Note No. WSHDC-10678

    The Embassy of Canada presents its compliments to the Department of State and has the honour to request the extradition of Jimmy Miller, a Canadian and an American citizen, born on November 9, 2000.

    A photograph of the person sought is appended to the documents submitted in support of the extradition request.

    Canada is seeking the extradition of Jimmy Miller to stand trial in relation to:

- One count of sexual assault with a weapon, contrary to section 272(1)(a) of the *Criminal Code*;

- Three counts of sexual assault, contrary to s. 271 of the *Criminal Code*;

- Four counts of sexual interference, contrary to s. 151 of the *Criminal Code*;

- One count of utter threat to cause death, contrary to s. 264.1(1)(a) of the *Criminal Code*;

- Two counts of invitation to sexual touching, contrary to s. 152 of the *Criminal Code*;

- Two counts of possession of a weapon for the purpose of committing an offence, contrary to s. 88(1) of the *Criminal Code*; and

- One count of use of an imitation firearm while committing an indictable offence, contrary to s. 85(2) of the *Criminal Code*.

.../2



-2-

Information number 21-A3664 was filed in the Ontario Court of Justice, Oshawa, Ontario, by Special Constable Elizabeth Pennington on August 13, 2021, before Justice of the Peace Louis Bourgon.  Warrant for arrest was issued on August 13, 2021, by Justice of the Peace Louis Bourgon  of the Ontario Court of Justice, Oshawa, Ontario.

There is no statute of limitations in respect of the offences for which the person sought stands charged.  The indictable offences are punishable by more than one-year imprisonment. The present location of the accused is 5856 Brecksville Road, Independence, Ohio.

The Prosecuting Attorney is Andrew Hotke, Crown Counsel, Crown Law Office-Criminal, Ministry of the Attorney General for the Province of Ontario. The Police contact is Detective Constable Jennifer Kavanagh, Special Victims Unit, Durham Regional Police Service.

The Embassy of Canada avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

WASHINGTON, D.C.

June 9, 2022



TREATIES AND OTHER INTERNATIONAL ACTS SERIES 8237

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and CANADA

Signed at Washington December 3, 1971

*and*

Agreement Amending the Treaty
Effected by Exchange of Notes
Signed at Washington June 28 and July 9, 1974



MILLER_Ext_0005

# CANADA

## Extradition

*Treaty signed at Washington December 3, 1971;*
*And agreement amending the treaty*
*Effected by exchange of notes*
*Signed at Washington June 28 and July 9, 1974;*
*Ratification of the treaty, as amended, advised by the Senate of*
*the United States of America December 1, 1975;*
*Ratified by the President of the United States of America De-*
*cember 12, 1975;*
*Ratified by Canada February 2, 1976;*
*Ratifications exchanged at Ottawa March 22, 1976;*
*Proclaimed by the President of the United States of America*
*May 6, 1976;*
*Entered into force March 22, 1976.*

———————

By the President of the United States of America

## A PROCLAMATION

Considering that:

The Treaty on Extradition between the United States of America and Canada was signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada;

The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, therefore, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended,

TIAS 8237

MILLER_Ext_0006

2

to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six [SEAL] and of the Independence of the United States of America the two hundredth.

GERALD R. FORD

By the President:
JOSEPH JOHN SISCO
*Acting Secretary of State*

TIAS 8237

MILLER_Ext_0007

3

TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND CANADA

The United States of America and Canada, desiring to make
more effective the cooperation of the two countries in the
repression of crime by making provision for the reciprocal
extradition of offenders, agree as follows:

TIAS 8237

MILLER_Ext_0008

4

### ARTICLE 1

Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty committed within the territory of the other, or outside thereof under the conditions specified in Article 3(3) of this Treaty.

### ARTICLE 2

(1)  Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

(2)  Extradition shall also be granted for attempts to commit, or conspiracy to commit or being a party to any of the offenses listed in the annexed Schedule.

(3)  Extradition shall also be granted for any offense against a federal law of the United States in which one of the offenses listed in the annexed Schedule, or made extraditable by paragraph (2) of this Article, is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

### ARTICLE 3

(1)  For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including air space

TIAS 8237

MILLER_Ext_0009

5

and territorial waters and vessels and aircraft registered in
that Contracting Party or aircraft leased without crew to a lessee
who has his principal place of business, or, if the lessee has
no such place of business, his permanent residence in, that
Contracting Party if any such aircraft is in flight, or if any
such vessel is on the high seas when the offense is committed.
For the purposes of this Treaty an aircraft shall be considered
in flight from the moment when power is applied for the purpose
of the take-off until the moment when the landing run ends.

(2)  In a case when offense 23 of the annexed Schedule is
committed on board an aircraft at any time from the moment when
all its external doors are closed following embarkation until
the moment when any such door is opened for disembarkation, such
offense and any other offense covered by Article 2 committed
against passengers or crew of that aircraft in connection with
such offense shall be considered to have been committed within
the territory of a Contracting Party if the aircraft was
registered in that Contracting Party, if the aircraft landed in
the territory of that Contracting Party with the alleged offender
still on board, or if the aircraft was leased without crew to a
lessee who has his principal place of business, or, if the lessee
has no such place of business, his permanent residence in that
Contracting Party.

(3)  When the offense for which extradition has been requested
has been committed outside the territory of the requesting State,
the executive or other appropriate authority of the requested
State shall have the power to grant the extradition if the laws
of the requested State provide for jurisdiction over such an
offense committed in similar circumstances.

TIAS 8237

MILLER_Ext_0010

6

### ARTICLE 4

(1)  Extradition shall not be granted in any of the following circumstances:

(i)  When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

(ii) When the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character.  If any question arises as to whether a case comes within the provisions of this subparagraph, the authorities of the Government on which the requisition is made shall decide.

(2)  The provisions of subparagraph (iii) of paragraph (1) of this Article shall not be applicable to the following:

(i)  A kidnapping, murder or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt to commit such an offense with respect to any such person.

(ii) When offense 23 of the annexed Schedule, or an attempt to commit, or a conspiracy to commit, or being a party to the commission of that offense, has been committed  on board an aircraft engaged in commercial services carrying passengers.

TIAS 8237

MILLER_Ext_0011

7

## ARTICLE 5

If a request for extradition is made under this Treaty for a person who at the time of such request, or at the time of the commission of the offense for which extradition is sought, is under the age of eighteen years and is considered by the requested State to be one of its residents, the requested State, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting State that the request for extradition be withdrawn, specifying the reasons therefor.

## ARTICLE 6

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

## ARTICLE 7

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

MILLER_Ext_0012

8

### ARTICLE 8

The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

### ARTICLE 9

(1)  The request for extradition shall be made through the diplomatic channel.

(2)  The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3)  When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4)  When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting State, by a statement showing how much of the sentence has not been served, and by evidence proving that the person requested is the person to whom the sentence refers.

TIAS 8237

MILLER_Ext_0013

9

### ARTICLE 10

(1)  Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

(2)  The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada, or when, in the case of a request emanating from the United States, they are authenticated by an officer of the Department of State of the United States and are certified by the principal diplomatic or consular officer of Canada in the United States.

### ARTICLE 11

(1)  In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.

**TIAS 8237**

**MILLER_Ext_0014**

10

(2)  On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3)  A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received.  This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

ARTICLE 12

(1)  A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i)  He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii) He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii) The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his extradition to a third State, provided such other offense is covered by Article 2.

(2)  The foregoing shall not apply to offenses committed after the extradition.

TIAS 8237

MILLER_Ext_0015

11

ARTICLE 13

(1)  A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought.

(2)  Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

ARTICLE 14

(1)  The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)  If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

ARTICLE 15

(1)  To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered to the requesting State if extradition is granted.

TIAS 8237

MILLER_Ext_0016

12

(2)  Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall be returned to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

ARTICLE 16

(1)  The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

(2)  The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE 17

(1)  Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State.  The appropriate legal officers of the State in which the extradition proceedings take place shall, by all legal means within their power, assist the requesting State before the respective judges and magistrates.

TIAS 8237

MILLER_Ext_0017

13

(2)  No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

ARTICLE 18

(1)  This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2)  This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3)  This Treaty shall enter into force upon the exchange of ratifications.[1] It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

---

[1] Mar. 22, 1976.

TIAS 8237

MILLER_Ext_0018

14

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and French languages, each language version being equally authentic, at Washington this third day of December, one thousand nine hundred seventy one.

FOR THE UNITED STATES OF AMERICA:

[1]

FOR CANADA:

[2]

---

[1] William P. Rogers
[2] Mitchell Sharp

TIAS 8237

15

SCHEDULE

1.   Murder; assault with intent to commit murder.

2.   Manslaughter.

3.   Wounding; maiming; or assault occasioning bodily harm.

4.   Unlawful throwing or application of any corrosive substances
     at or upon the person of another.

5.   Rape; indecent assault.

6.   Unlawful sexual acts with or upon children under the age
     specified by the laws of both the requesting and requested
     States.

7.   Willful nonsupport or willful abandonment of a minor when
     such minor is or is likely to be injured or his life is or
     is likely to be endangered.

8.   Kidnapping; child stealing; abduction; false imprisonment.

9.   Robbery; assault with intent to steal.

10.  Burglary; housebreaking.

11.  Larceny, theft or embezzlement.

12.  Obtaining property, money or valuable securities by false
     pretenses or by threat of force or by defrauding the public
     or any person by deceit or falsehood or other fraudulent
     means, whether such deceit or falsehood or any fraudulent
     means would or would not amount to a false pretense.

13.  Bribery, including soliciting, offering and accepting.

14.  Extortion.

TIAS 8237

MILLER_Ext_0020

16

15. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.

16. Fraud by a banker, agent, or by a director or officer of any company.

17. Offenses against the laws relating to counterfeiting or forgery.

18. Perjury in any proceeding whatsoever.

19. Making a false affidavit or statutory declaration for any extrajudicial purpose.

20. Arson.

21. Any act done with intent to endanger the safety of any person travelling upon a railway, or in any aircraft or vessel or other means of transportation.

22. Piracy, by statute or by law of nations; mutiny or revolt on board a vessel against the authority of the captain or commander of such vessel.

23. Any unlawful seizure or exercise of control of an aircraft, by force or violence or threat of force or violence, or by any other form of intimidation, on board such aircraft.

24. Willful injury to property.

25. Offenses against the bankruptcy laws.

26. Offenses against the laws relating to the traffic in, production, manufacture, or importation of narcotic drugs, Cannabis sativa L., hallucinogenic drugs, amphetamines, barbiturates, cocaine and its derivatives.

MILLER_Ext_0021

17

27. Use of the mails or other means of communication in connection with schemes devised or intended to deceive or defraud the public or for the purpose of obtaining money or property by false pretenses.

28. Offenses against federal laws relating to the sale or purchase of securities.

29. Making or having in possession any explosive substance with intent to endanger life, or to cause severe damage to property.

30. Obstructing the course of justice in a judicial proceeding, existing or proposed, by:

    a)   dissuading or attempting to dissuade a person by threats, bribes, or other corrupt means from giving evidence;

    b)   influencing or attempting to influence by threat, bribes, or other corrupt means a person in his conduct as a juror; or

    c)   accepting a bribe or other corrupt consideration to abstain from giving evidence or to do or to refrain from doing anything as a juror.

TIAS 8237

MILLER_Ext_0022

35

[AMENDING AGREEMENT]

*The Canadian Ambassador to the Secretary of State*



Canadian Embassy                Ambassade du Canada

Washington, D.C.

June 28, 1974

No. 126

Excellency,

    I have the honour to refer to the Treaty on Extra-
dition between the Government of Canada and the Government
of the United States signed at Washington on December 3,
1971 and to subsequent discussions between representatives
of our two governments concerning the amendment of the said
Treaty.

    Further to those discussions I now have the honour
to propose that the said Treaty be amended as follows:

        (1) That Article 4(2)(i) of the Treaty shall
            be amended to read:  "A kidnapping, murder,
            or other assault against the life or physical
            integrity of a person to whom a Contracting
            Party has the duty according to international
            law to give special protection, or any attempt
            or conspiracy to commit, or being a party to

The Honourable
  Henry A. Kissinger,
    Secretary of State,
      Washington, D.C.
        20520

TIAS 8237

MILLER_Ext_0023

36

the commission of, such an offence with
respect to any such person."

(?) That clause 26 of the Schedule annexed to
the Treaty shall be amended to read:
"Offences against the laws relating to
the traffic in, production, manufacture or
importation of drugs listed in Schedule I
to the Single Convention on Narcotic Drugs
of March 30, 1961[1] and of drugs listed in
Schedules I, II and III to the Convention
on Psychotropic Substances of February 21,
1971."

If this proposal meets with the approval of your
government, I have the further honour to propose that
this Note, which is authentic in English and in French,
and your reply shall constitute an amendment to the Treaty
on Extradition between Canada and the United States referred
to above, which shall come into force on the date of the
entry into force of the said Treaty and which shall be con-
sidered an integral part of the said Treaty.

Accept, Excellency, the assurances of my highest
consideration.

M. Cadieux,
Ambassador.

---

[1] TIAS 6298; 18 UST 1559.

TIAS 8237

39

*The Secretary of State to the Canadian Ambassador*

DEPARTMENT OF STATE
WASHINGTON

July 9, 1974

Excellency:

I have the honor to refer to your note of
June 28, 1974, in the English and French languages,
relating to amendment of the Treaty on Extradition
between the United States of America and Canada,
signed at Washington December 3, 1971.

On behalf of the United States of America I
confirm the understanding set forth therein and
consider that your note and this reply constitute
an agreement between the United States and Canada on
this matter.

Accept, Excellency, the renewed assurances of
my highest consideration.

For the Secretary of State:

Acting Secretary

*Joseph John Sisco*

His Excellency

Marcel Cadieux,

Ambassador of Canada.

TIAS 8237
U.S. GOVERNMENT PRINTING OFFICE :1976  O—73-798

**MILLER_Ext_0025**

| 101st Congress<br>*2d Session* | SENATE | Treaty Doc.<br>101–17 |
| --- | --- | --- |

# PROTOCOL AMENDING THE EXTRADITION TREATY WITH CANADA

## MESSAGE

### FROM

# THE PRESIDENT OF THE UNITED STATES

#### TRANSMITTING

THE PROTOCOL SIGNED AT OTTAWA ON JANUARY 11, 1988, AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA, SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974



April 24, 1990.—Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

39–118                                            WASHINGTON : 1990

MILLER_Ext_0026

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *April 24, 1990.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol signed at Ottawa on January 11, 1988, amending the Treaty on Extradition Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. I transmit also, for the information of the Senate, the report of the Department of State with respect to the protocol.

The protocol amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. It represents an important step in improving law enforcement cooperation and combatting terrorism by excluding from the scope of the political offense exception serious offenses typically committed by terrorists; e.g., murder, manslaughter, kidnapping, use of an explosive device capable of endangering life or causing grievous bodily harm, and attempt or conspiracy to commit the foregoing offenses.

The protocol also will help to improve implementation of the current extradition treaty in several other respects. Most significant, the protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, *inter alia,* parental child abduction and certain additional narcotics offenses will be covered by the new treaty.

I recommend that the Senate give early and favorable consideration to the protocol and give its advice and consent to ratification.

GEORGE BUSH.

(III)

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, April 10, 1990.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Protocol amending the 1971 Extradition Treaty Between the United States of America and Canada signed at Ottawa January 11, 1988. I recommend that the Protocol be transmitted to the Senate for advice and consent to ratification.

The Protocol supplements and amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974 (27 U.S.T. 983; TIAS 8237). The Protocol would exclude specified crimes of violence, typically committed by terrorists, from the scope of the political offense exception to extradition. It therefore represents an important step toward improving law enforcement cooperation and countering the threat of international terrorism and other crimes of violence. In addition, the Protocol will help improve the implementation of the current Treaty in several other respects. Most significantly, the Protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, inter alia, parental child abduction and certain additional narcotics offenses will be covered.

Article 2 of the 1971 Extradition Treaty, as amended, which incorporates a Schedule of extraditable offenses, has been replaced in its entirety. Pursuant to the current Extradition Treaty, only crimes that are listed in the Schedule are considered extraditable offenses. As amended by Article I of the Protocol, Article 2 of the 1971 Treaty, as amended, adopts a dual criminality approach, which emphasizes extradition based on underlying criminal conduct rather than for a particular offense. A dual criminality clause permits extradition for any crime that is punishable in both countries by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause, therefore, obviates the need to renegotiate or supplement the Treaty as offenses, such as computer-related crimes or money laundering, become punishable under the laws of both states.

Article I of the Protocol replaces Article 2 of the 1971 Treaty and provides that an offense is extraditable notwithstanding that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States. This provision will allow the United States to request extradition for offenses including interstate and foreign travel or transportation in aid of racketeering enterprises

(1)

2

even though the Canadian laws do not include analogous jurisdictional elements for similar underlying criminal behavior. The new provision also stipulates that offenses that relate to taxation or revenue or that are of a "purely fiscal character" will be extraditable offenses.

Article II of the Protocol is a technical amendment, deleting the Schedule of extraditable offenses annexed to the 1971 Treaty, as amended, and incorporated by reference in Article 2.

Article III of the Protocol deletes Article 3 of the 1971 Treaty, in which a particularized definition of "territory," which was necessary at that time to cover certain types of hijacking offenses, is no longer necessary, as both the United States and Canada are parties to the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague December 16, 1970, and entered into force October 14, 1971, (Hijacking Convention) (22 U.S.T. 1641; TIAS 7192) and the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal September 23, 1971, and entered into force January 26, 1973, (Sabotage Convention) (24 U.S.T. 564; TIAS 7570).

Article 3(3) of the 1971 Treaty is amended to give the Executive or other appropriate Authority the discretion to extradite fugitives when the requesting state has jurisdiction over an offense in a situation where the laws of the requested state would not provide for jurisdiction in similar circumstances.

Article IV of the Protocol replaces Article 4 of the 1971 Treaty, and effectively limits the scope of the political offense exception. It specifies certain crimes which shall not be regarded as political offenses, including murder, manslaughter, malicious assault, kidnapping, specified explosives offenses, and conspiracy or attempt to commit any of the foregoing offenses.

In addition, Article IV of the Protocol includes a provision that excludes from the reach of the political offense exception any offense for which both the United States and Canada have an international treaty obligation to extradite the person or submit his case for prosecution; e.g., aircraft hijacking pursuant to the Hijacking Convention; aircraft sabotage pursuant to the Sabotage Convention; crimes against internationally protected persons, including diplomats, under the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, done at New York December 14, 1973 (28 U.S.T. 1975; TIAS 8532); and hostage taking pursuant to the International Convention against the Taking of Hostages, done at New York on December 17, 1979. This exception will also extend to crimes similarly defined in future multilateral treaties.

Article V of the Protocol replaces Article 7 of the 1971 Extradition Treaty, which allows the Requested State to defer surrender of a fugitive being proceeded against or serving a sentence in its territory until the conclusion of the proceedings and the full execution of any punishment. Under the Protocol, the Requested State has the discretion to choose to extradite to the Requesting State a fugitive who is serving a prison sentence in the Requested State before the expiration of his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

3

Article VI of the Protocol replaces Article 11(3) of the current Treaty to extend the period of provisional arrest in the Requested State from forty-five days to sixty days, which is the time period most commonly provided under U.S. extradition treaties. The extension will allow prosecutors greater latitude in assembling extradition packages and in making necessary adjustments or additions to the documents.

Article VII of the Protocol amends the 1971 Treaty by adding a provision that establishes that, in cases where both states have jurisdiction to prosecute for an offense, the Executive Authority of the Requested State will consult with the Executive Authority of the Requesting State and make a decision whether to extradite the fugitive, or whether to submit the case to its competent authorities for the purpose of prosecution, after considering all relevant factors.

Article VIII of the Protocol provides that its provisions shall apply to any offense committed, any request made or any person found extraditable before or after the entry into force of the Protocol, but shall not apply to an offense committed before the Protocol enters into force if the offense in question was not an offense under the laws of both Contracting Parties at the time of its commission.

Article IX of the Protocol sets forth the procedures for ratification and entry into force.

I enclose, for the information of the Senate, an exchange of letters, dated January 11, 1988, which restates that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters," is an extraditable offense under the 1971 Extradition Treaty.

The Department of Justice joins the Department of State in favoring transmission of this Protocol to the Senate at the earliest possible date.

Respectfully submitted,

JAMES W. BAKER III.

Enclosure: As stated.

THE SECRETARY OF STATE,
*Washington, January 11, 1988.*

Hon. JOE CLARK, P.C., M.P.,
*Secretary of State for External Affairs of Canada, Ottawa.*

DEAR MR. MINISTER: I refer to the Protocol Amending the Treaty on Extradition between the United States and Canada we signed today and have the honor to address to you the following.

The United States and Canada recognize that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters", is an extraditable offense under the United States-Canada Extradition Treaty.

Where a person has been charged with or convicted of such an offense in Canada and is found within the jurisdiction of the United States, the United States agrees, upon request, to commence extradition proceedings against such a person pursuant to the Treaty in order that the person may be returned to Canada.

4

The United States will use its best efforts to honor Canadian requests for testimony, information, or other assistance pertaining to such abductions.

Canada and the United States agree to cooperate to deter such transborder abductions. To assist in achieving that purpose, the United States will continue to exert its best efforts to inform those engaged in business as bail bondsmen or bounty hunters and other interested parties of the positions set forth in this exchange of letters.

Canada and the United States agree to consult promptly concerning any case of transborder abduction involving bounty hunters which might arise in the future. The purpose of such consultations shall be to address matters relating to any such case, including any request by the Government of Canada for the return of the person so abducted. In the event of return, the Governments agree to cooperate to have the abducted person escorted to Canada and taken into custody at the border, pursuant to a request for provisional arrest, pending the outcome of extradition proceedings. For the purpose of these consultations, the principal law enforcement contact for the United States will be the Director of the Office of International Affairs of the Criminal Division of the Department of Justice.

I have the honor to propose that this letter and your reply constitute an understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Sincerely yours,

GEORGE P. SHULTZ.

OTTAWA, *January 11, 1988.*

JLA–0026.

Hon. GEORGE P. SHULTZ,
*Secretary of State of the United States of America.*

DEAR MR. SECRETARY: I have the honour to acknowledge receipt of your letter of today's date concerning transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters". I accept your proposal that your letter and this reply constitute an Understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Yours sincerely,

JOE CLARK.

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

The Government of the United States of America and the Government of Canada;

Desiring to make more effective the Extradition Treaty between the Contracting Parties, signed at Washington on December 3, 1971, as amended by the agreement effected by an Exchange of Notes on June 28 and July 9, 1974 (hereinafter referred to as "the Extradition Treaty");

Have agreed as follows:

ARTICLE I

Article 2 of the Extradition Treaty is deleted and replaced by the following:

"ARTICLE 2

"(1) Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

"(2) An offense is extraditable notwithstanding

"(i) that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States, or

"(ii) that it relates to taxation or revenue or is one of a purely fiscal character."

ARTICLE II

The SCHEDULE to the Extradition Treaty, as amended, is deleted.

ARTICLE III

Paragraph (2) of Article 3 of the Extradition Treaty is deleted. Paragraph (3) of Article 3 of the Extradition Treaty is amended to read as follows:

"(2) When the offense for which extradition is requested was committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall grant extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances. If the laws in the requested State do not so provide, the executive

(5)

MILLER_Ext_0032

authority in the requested State may, in its discretion, grant extradition."

## ARTICLE IV

Paragraph (2) of Article 4 of the Extradition Treaty, as amended, is deleted and replaced by the following:

"(2) For the purpose of this Treaty, the following offenses shall be deemed not to be offenses within subparagraph (iii) of paragraph 1 of this Article:

"(i) An offense for which each Contracting Party has the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to its competent authorities for the purpose of prosecution;

"(ii) Murder, manslaughter or other culpable homicide, malicious wounding or inflicting grievous bodily harm;

"(iii) An offense involving kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

"(iv) An offense involving the placing or use of explosives, incendiaries or destructive devices or substances capable of endangering life or of causing grievous bodily harm or substantial property damage; and

"(v) An attempt or conspiracy to commit, or counselling the commission of, any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses."

## ARTICLE V

Article 7 of the Extradition Treaty is deleted and replaced by the following:

## "ARTICLE 7

"When the person sought is being proceeded against or is serving a sentence in the requested State for an offense other than that for which extradition is requested, the requested State may surrender the person sought or postpone surrender until the conclusion of the proceedings or the service of the whole or any part of the sentence imposed."

## ARTICLE VI

Paragraph (3) of Article 11 of the Extradition Treaty is deleted and replaced by the following:

"(3) A person arrested shall be set at liberty upon the expiration of sixty days from the date of arrest pursuant to such application if a request for extradition and the documents specified in Article 9 have not been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request and documents are subsequently received."

## ARTICLE VII

The Extradition Treaty is amended by adding the following after Article 17:

7

"ARTICLE 17 BIS

"If both contracting Parties have jurisdiction to prosecute the person for the offense for which extradition is sought, the executive authority of the requested State, after consulting with the executive authority of the requesting State, shall decide whether to extradite the person or to submit the case to its competent authorities for the purpose of prosecution. In making its decision, the requested State shall consider all relevant factors, including but not limited to:

"(i) the place where the act was committed or intended to be committed or the injury occurred or was intended to occur;

"(ii) the respective interests of the Contracting Parties;

"(iii) the nationality of the victim or the intended victim; and

"(iv) the availability and location of the evidence."

ARTICLE VIII

Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date.

ARTICLE IX

(1) This Protocol shall be subject to ratification in accordance with the applicable procedures of the Government of the United States and the Government of Canada and instruments of ratification shall be exchanged as soon as possible.

(2) The Protocol shall enter into force upon the exchange of instruments of ratification.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Ottawa, this 11th day of January 1988, in the English and French languages, the two texts being equally authentic.

For the Government of the United States of America.

GEORGE P. SHULTZ.

For the Government of Canada.

JOE CLARK.

O

| 107TH CONGRESS 2d Session | SENATE | TREATY DOC. 107–11 |
| --- | --- | --- |

SECOND PROTOCOL AMENDING EXTRADITION TREATY
WITH CANADA

———

MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION
BETWEEN THE GOVERNMENT OF THE UNITED STATES OF
AMERICA AND THE GOVERNMENT OF CANADA, SIGNED AT OT-
TAWA ON JANUARY 12, 2001



JULY 11, 2002.—The Protocol was read the first time, and together with
the accompanying papers, referred to the Committee on Foreign Rela-
tions and ordered to be printed for the use of the Senate

———

U.S. GOVERNMENT PRINTING OFFICE

99–118                    WASHINGTON : 2002

## LETTER OF TRANSMITTAL

———————

THE WHITE HOUSE, *July 11, 2002.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Second Protocol Amending the Treaty on Extradition Between the Government of the United States of America and the Government of Canada, as amended, signed at Ottawa on January 12, 2001. In addition, I transmit, for the information of the Senate, the report of the Department of State with respect to the Second Protocol. As the report explains, the Second Protocol will not require implementing legislation.

The Second Protocol amends the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988.

The Second Protocol, upon entry into force, will enhance cooperation between the law enforcement communities of both nations. The Second Protocol incorporates into the U.S.-Canada Extradition Treaty a provision on temporary surrender of persons that is a standard provision in more recent U.S. bilateral extradition treaties. It also provides for new authentication requirements of documentary evidence, which should streamline the processing of extradition requests.

I recommend that the Senate give early and favorable consideration to the Second Protocol and give its advice and consent to ratification.

GEORGE W. BUSH.

(III)

## LETTER OF SUBMITTAL

———————

DEPARTMENT OF STATE,
*Washington, May 31, 2002.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Second Protocol Amending the Treaty on Extradition Between the Government of the United states of America and the Government of Canada, signed at Ottawa on January 12, 2001 ("Second Protocol"). I recommend that the Second Protocol be transmitted to the Senate for its advice and consent to ratification.

The Second Protocol will strengthen the U.S.-Canada extradition relationship by incorporating a temporary surrender mechanism into the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988 ("Extradition Treaty"). The Second Protocol will also streamline the extradition process by modifying the Extradition Treaty's authentication requirements relating to the admissibility of documentary evidence.

A temporary surrender mechanism has become a standard provision in more recent U.S. bilateral extradition treaties. It allows person who have been found extraditable to be temporarily surrendered to one State to stand trial while they are still serving sentences in the other State. Temporary surrender can be an important tool for use in cases where serious crimes have been committed in one country which might go unpunished if trial in that country were to be delayed for a long period while a sentence was being served for crimes committed in the other country. It enables sequential trials of individuals who have committed extraditable offenses in both countries at a time when witnesses and evidence to both crimes are more readily available.

Article 1 of the Second Protocol amends the Extradition Treaty to provide for a new Article 7bis, which will follow Article 7's existing provisions authorizing the State in receipt of an extradition request ("requested State") to delay surrender until after proceedings against a person in that State have been completed or the person's sentence in that State has been served.

New article 7bis(1) provides that if the requested State has granted an extradition request in accordance with the Treaty with respect to a person who already has been convicted and sentenced in the requested State, it may temporarily surrender the person to the requesting State for prosecution. It further provides that the courts of the requested State must not be divested by virtue of the temporary surrender of jurisdiction over any appeal or habeas cor-

(V)

MILLER_Ext_0037

VI

pus application relating to the conviction or sentence in the requested State.

Article 7bis(2) provides that the person surrendered pursuant to paragraph (1) must be kept in custody in the requesting State. It also provides that the person must be returned to the requested State within forty-five days after the conclusion of the proceedings for which the person's presence was required or at another time as specified by the requested State, in accordance with conditions determined by the Parties. This provision anticipates that authorities in the United States and Canada, which in some cases will include state-level authorities, will consult to determine appropriate conditions for the temporary surrender of an individual, including arrangements for the transfer and return of the prisoner, as well as any extraordinary matters that may be relevant, such as medical care requirements. Consistent with our normal extradition practice, any case-specific agreements or assurances relating to the temporary surrender would be concluded by the federal authorities on behalf of state authorities. Similar to the language in paragraph (1), Article 7bis(2) also provides that the transfer of the person back to the requested State will not divest the courts of the requesting State of jurisdiction over any appeal or habeas corpus application relating to the matter for which the prisoner was temporarily surrendered.

Article 7bis(3) provides that the time spent in custody in the requesting State may be credited to the sentence in the requested State. In the case of the United States, credit for time served by a person surrendered to Canadian authorities may differ among U.S. state and federal authorities.

Article 7bis(4) provides that the requested State can waive the return of the surrendered person in the event the person's sentence in the requested State expires during the temporary surrender period. Article 7bis(4) provides that in such cases the person's surrender shall be considered a "final surrender" under the Extradition Treaty.

Because temporary surrender is contingent on a grant of extradition, Article 7bis(5) provides that the requesting State does not have to make a further request for the extradition of a person who has been returned to the requested State after having been convicted and sentenced in the requesting State for the offense for which temporary surrender was granted.

Article 7bis(6) provides that a person who has been returned to the requested State, after having been convicted and sentenced during a temporary surrender, must be finally surrendered once the custodial portion of the person's sentence in the requested State has been completed or, if the requested State so specifies, at an earlier time. This provision contemplates that the requested State will finally surrender a person who has been released on parole or under other conditions. It also envisions that the requested State may choose to surrender the person at an earlier time.

Article 7bis(7) recognizes that there may be reasons not to proceed with final surrender even though the person was convicted and sentenced during a temporary surrender. Article 7bis(7) (a) provides that final surrender will not take place when the requesting State advises that it is no longer required because the sentence

MILLER_Ext_0038

VII

imposed in the requesting State has expired or for other reasons. Similarly, Article 7bis(7) (b) provides that the person will not be surrendered to the requesting State in the event the competent authority of the requested State revokes its original grant of extradition.

Article 2 of the Second Protocol will establish a new framework for the admissibility of documentary evidence in support of a request for extradition by replacing existing Article 10(2) of the Extradition Treaty.

Consistent with U.S. extradition law on the admissibility of documentation, new Article 10(2)(a) reiterates the existing requirement that, in the case of a request from Canada, documents be authenticated by an officer of the Department of Justice of Canada and certified by the principal diplomatic or consular office of the United States in Canada. Article 10(2)(b), however, changes existing requirements with respect to requests emanating from the United States, so as to take advantage of changes in Canadian law regarding the admissibility of extradition documents in Canadian courts. Specifically, Article 10(2)(b) eliminates the requirement that the United States have its documentary evidence in support of extradition requests to Canada authenticated by an officer of the U.S. Department of State and certified by the principal diplomatic or consular office of Canada in the United States. Instead, Article 10(2) (b) streamlines the authentication process by allowing documents to be certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. When the person whose extradition is sought has already been convicted, documents supporting the U.S. request are to be certified by a judicial, prosecuting or correctional authority who can attest to the fact that the documents are accurate. These changes should simplify and thereby reduce the administrative burden of processing extradition requests by the United States.

New Article 10(2) (c) provides an alternative to subparagraphs (a) and (b), by providing that documents may also be certified or authenticated in any other manner accepted by the law of the requested State. This addition will enable both countries to take advantage of any changes to their applicable laws.

Article 3 of the Second Protocol addresses the relationship between the Second Protocol and the Extradition Treaty. Paragraph (1) provides that the Second Protocol will form an integral part of the Extradition Treaty. Paragraph (2) provides for retroactivity, noting that, notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, the Second Protocol will apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date. Finally, paragraph (3) provides that the Second Protocol is subject to ratification, and enters into force upon the exchange of instruments of ratification. The Second Protocol would terminate upon termination of the Extradition Treaty.

The Second Protocol does not require implementing legislation. A Technical Analysis explaining in detail the provisions of the Second Protocol is being prepared by the United States negotiating delegation, consisting of the Departments of State and Justice, and will

VIII

be submitted separately to the Senate Committee on Foreign Relations.

    The Department of Justice joins the Department of State in favoring approval of this Second Protocol by the Senate at an early date.

    Respectfully submitted,

COLIN L. POWELL.

MILLER_Ext_0040

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNEMENT OF CANADA

Signed at Washington on December 3, 1971,
as amended by an Exchange of Notes at Washington on June 28 and July 9, 1974,
and by a Protocol signed at Ottawa on January 11, 1988

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA (hereinafter "the Parties");

RECOGNIZING the close bilateral relationship which exists between them, reflected in numerous instruments and mechanisms of legal cooperation;

COMMITTED to strengthening legal cooperation in the fight against crime; and

DESIRING to make more effective the Extradition Treaty between the Parties, signed at Washington on December 3, 1971 (hereinafter "the Extradition Treaty"), as amended by an exchange of notes of June 28 and July 9, 1974, and the Protocol to the Extradition Treaty between the Parties, signed at Ottawa on January 11, 1988 (hereinafter "the Protocol");

HAVE AGREED as follows:

ARTICLE 1

The Extradition Treaty is amended by adding the following after Article 7:

"Article 7 bis

1.      The requested State, after granting an extradition request made in accordance with the Extradition Treaty, may temporarily surrender a person who has been convicted and sentenced in the requested State, in order that the person sought may be prosecuted in the requesting State. The temporary surrender of the person shall not divest the Courts in the requested State of jurisdiction over any appeal or habeas corpus application relating to the conviction or sentence that otherwise may be available under the laws of the requested State.

(1)

2

2.      A person temporarily surrendered pursuant to paragraph 1 shall be kept in custody in the requesting State. The person shall be returned to the requested State within forty-five (45) days after the conclusion of the proceedings for which the person's presence was required in the requesting State or at another time as specified by the requested State, in accordance with conditions to be determined by the Parties for that purpose.   The return of the person to the requested State shall not divest the Courts in the requesting State of jurisdiction over any appeal or habeas corpus application that otherwise may be available under the laws of that State, in relation to the matter for which the person was temporarily surrendered.

3.      The period of time spent in custody in the requesting State may be credited to the sentence in the requested State.

4.      When the sentence that the person was serving in the requested State expires during the temporary surrender, the requested State may waive the return of the person and the surrender will be considered to be a final surrender.  A "final surrender" is a surrender of a person pursuant to this Treaty other than as provided for by this Article.

5.      Subject to paragraph 7, if a person temporarily surrendered and returned to the requested State has been sentenced to imprisonment in the requesting State for the offence for which the person was temporarily surrendered, the person shall be finally surrendered to the requesting State, in accordance with paragraph 6, without a further request for extradition.

6.      Final surrender shall take place when the person has finished serving the custodial portion of the sentence in the requested State, or at an earlier time specified by the requested State.

7.      Final surrender shall not take place when:

(a)      the requesting State advises that final surrender is no longer required due to the expiration of the sentence imposed or for other reasons; or

(b)      after the temporary surrender, the warrant or order for the final surrender of a person sought is revoked by the competent authority of the requested State."

## ARTICLE 2

Article 10(2) of the Extradition Treaty is deleted and replaced by the following text:

"(2)  The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when:

(a)      in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada;

3

(b)     in the case of a request emanating from the United States for a person who is sought for prosecution, they are certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. In the case of a request emanating from the United States for a person who is sought in connection with a conviction, the documents must be certified by a judicial, prosecuting or correctional authority who attests to the fact that the documents are accurate; or

(c)     they are certified or authenticated in any other manner accepted by the law of the requested State."

### ARTICLE 3

1.     This Second Protocol shall form an integral part of the Extradition Treaty.

2.     Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Second Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

3.     This Second Protocol shall be subject to ratification, and shall enter into force upon the exchange of instruments of ratification.  It shall terminate upon termination of the Extradition Treaty.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Second Protocol.

DONE in duplicate at *Ottawa* this *Twelfth* day of *January* 2001 in the English and French languages, the two texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF
AMERICA

FOR THE GOVERNMENT
OF CANADA

MILLER_Ext_0043



Embassy of the United States of America

## Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition

### AMERICAN FOREIGN SERVICE

Ottawa, Canada, June 8, 2022

I, David L. Cohen, Ambassador of the United States of America at Ottawa, Canada, hereby certify that the annexed papers, being authenticated supporting documents proposed to be used upon an application for the extradition of **Jimmy Miller** who stands charged in the Province of Ontario with: one count of sexual assault with a weapon, contrary to s. 272(1)(a) of the *Criminal Code*; three counts of sexual assault, contrary to s. 271 of the *Criminal Code*; four counts of sexual interference, contrary to s. 151 of the *Criminal Code*; one count of utter threat to cause death, contrary to s. 264.1(1)(a) of the *Criminal Code*; two counts of invitation to sexual touching, contrary to s. 152 of the *Criminal Code*; two counts of possession of a weapon for the purpose of committing an offence, contrary to s. 88(1) of the *Criminal Code*; and, one count of use of an imitation firearm while committing an indictable offence, contrary to s. 85(2) of the *Criminal Code* are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Canada, as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed this 8th day of June, 2022.

_____
David L. Cohen
Ambassador of the
United States of America

Form 36- Foreign Service

SENSITIVE BUT UNCLASSIFIED

**MILLER_Ext_0044**



Department of Justice    Ministère de la Justice
Canada                   Canada

Ottawa, Canada
K1A 0H8


## CERTIFICATE OF AUTHENTICATION


IN THE MATTER OF the request for the extradition of **Jimmy Miller**
the United States of America to Canada


I, Cathy Chalifour, Senior Counsel, International Assistance Group, Department of Justice of Canada, do hereby certify:

THAT attached to this Certificate is authenticated documentation presented by Canada in support of the request for the extradition of **Jimmy Miller** who stands charged in the Province of Ontario with: one count of sexual assault with a weapon, contrary to s. 272(1)(a) of the *Criminal Code*; three counts of sexual assault, contrary to s. 271 of the *Criminal Code*; four counts of sexual interference, contrary to s. 151 of the *Criminal Code*; one count of utter threat to cause death, contrary to s. 264.1(1)(a) of the *Criminal Code*; two counts of invitation to sexual touching, contrary to s. 152 of the *Criminal Code*; two counts of possession of a weapon for the purpose of committing an offence, contrary to s. 88(1) of the *Criminal Code*; and, one count of use of an imitation firearm while committing an indictable offence, contrary to s. 85(2) of the *Criminal Code*.

THAT the documentation attached to this certificate is composed of:

- the Affidavit of Andrew Hotke, Crown Counsel, Ministry of the Attorney General for the Province of Ontario, which is appended:

    o  as exhibit "A", a copy of the Information filed in the Ontario Court of Justice, Oshawa, Ontario, by Special Constable Elizabeth Pennington on August 13, 2021, before Justice of the Peace Louis Bourgon;

    o  as exhibit "B", a copy of the Warrant for Arrest issued on August 13, 2021, by Justice of the Peace Louis Bourgon of the Ontario Court of Justice, Oshawa, Ontario.

- the Affidavit of Detective Constable Kavanagh, Special Victims Unit, Durham Regional Police Service.



THAT Kevin Rawluk, whose original signature appears at the end of the Affidavit of Andrew Hotke, is a Commissioner of Oaths for the Province of Ontario, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

THAT Cindy Lynn O'Connell, whose original signature appears at the end of the Affidavit of Detective Constable Kavanagh, is a Commissioner of Oaths for the Province of Ontario, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

The Seal of the Minister of Justice of Canada is hereby affixed this 7th day of June, 2022.

_____
Cathy Chalifour

MILLER_Ext_0046

| | | |
|---|---|---|
| **CANADA** | ) | **HER MAJESTY THE QUEEN** |
| | ) | |
| **PROVINCE OF ONTARIO** | ) | **v.** |
| | ) | |
| **CENTRAL EAST REGION** | ) | **Jimmy MILLER** |

**IN THE MATTER of a request by Canada for the extradition of JIMMY MILLER from the United States of America with respect to offences under the *Criminal Code* of Canada.**

===================================================

### AFFIDAVIT OF ANDREW HOTKE

===================================================

I, Andrew Hotke, of the City of Toronto, in the Toronto Region, in the Province of Ontario, Canada, MAKE OATH AND SAY AS FOLLOWS:

**A.     QUALIFICATIONS**

1.     I am a citizen of Canada.  I reside in the City of Toronto in the Province of Ontario, Canada. I received my law degree from the University of Toronto and was called to the Bar of the Province of Ontario in June 2016.  Since then, I have been, and continue to be, a member in good standing of the Law Society of Upper Canada and, as such, I am entitled to practice law as a barrister and solicitor in the Province of Ontario.

2.     From June 2016 until the present time, I have practiced law, and continue to practice law, in the employment of the Ministry of the Attorney General for the Province of Ontario.  During that period, and presently, I held the position of Crown Counsel with the Crown Law Office - Criminal of the Ministry of the Attorney General for the Province of Ontario, at the Ministry's offices, which is located at 720 Bay Street, Toronto, Ontario, Canada.  For a period of approximately seven months, in 2020-2021, I held the position of Assistant Crown Attorney at the Scarborough Crown's office in Scarborough Ontario, which is located at 1911 Eglinton Avenue East, Scarborough, Ontario.

- 2 -

3.      As a result of my training and experience, I am knowledgeable about criminal procedure and jurisprudence arising from both the *Criminal Code* of Canada and the common law in Canada.

4.      The Crown Law Office - Criminal is a branch of the Criminal Law Division of the Ministry of the Attorney General for the Province of Ontario, which has a wide variety of responsibilities relating to the administration of criminal justice in Ontario. The main responsibility of the Crown Law Office – Criminal involves the representation of the Crown in all criminal appeals in indictable matters arising in Ontario.  The Crown Law Office – Criminal also prosecutes serious crimes involving such matters as complex fraud, corruption, organized crime, and offences against the administration of justice.

5.      The Crown Law Office - Criminal has been directed to exercise responsibility on behalf of the Attorney General for Ontario with respect to applications by the Attorney General for Ontario for the extradition to Canada from foreign jurisdictions of persons charged in Ontario with offences contrary to the *Criminal Code* of Canada. Part of my responsibilities at the Crown Law Office – Criminal include responding to requests from Crown Prosecutors who seek to have a person extradited from a foreign jurisdiction to Canada.  When so tasked, I am involved in managing the request and I help the local Prosecutor and police prepare materials that will meet the requirements of foreign jurisdictions for official requests for extradition.  This work requires that I work with the Central Authority in Canada, the International Assistance Group, at the Department of Justice. I forward the materials prepared for an extradition request to the International Assistance Group so that they may be reviewed by the Central Authority in Canada and, if approved, sent to the foreign jurisdiction.

6.      In this case, the Crown Law Office – Criminal has been in contact with Assistant Crown Attorney Kerri Ann Kennedy, who is a prosecutor at the local Crown office involved with the request, and the police officer in charge of the case, Detective Constable Jennifer Kavanagh ("DC Kavanagh"), of the Durham Regional Police Service (DRPS).

7.      I have reviewed materials associated with the request, including synopses of the witness statements, investigative summaries/notes prepared by DC Kavanagh, and a synopsis for a guilty

- 3 -

plea. I have also reviewed DC Kavanagh's affidavit of fact. As a result, I am familiar with the facts of this case. Further, I have an expertise in criminal law such that I am able to attest to the sufficiency of the case and the jurisdiction in Canada to prosecute these offences.

**B.     OVERVIEW OF THE EXTRADITION REQUEST**

8.     Canada is seeking the extradition of Jimmy MILLER ("MILLER") so that he may be prosecuted on the following 14 charges laid against him in Ontario, Canada under the *Criminal Code* (*CC*):

- sexual assault with a weapon, contrary to s. 272(1)(a) of the *CC*;
- sexual assault (x3), contrary to section 271 of the *CC*;
- sexual interference (x4), contrary to section 151 of the *CC*;
- utter threat to cause death, contrary to section 264.1(1)(a) of the *CC*;
- invitation to sexual touching (x2), contrary to section 152 of the *CC*;
- possession of a weapon for the purpose of committing an offence (x2), contrary to section 88(1) of the *CC*; and
- use of an imitation firearm while committing an indictable offence, contrary to section 85(2) of the *CC*.

9.     These charges stem from allegations involving two minor victims under the age of 16: M.A. and G.A. I have used initials to protect their identities as they are minors.

10.     All allegations pertain to events alleged to have taken place in 2021. The allegations arise out of information that has been provided to police by M.A. and G.A.'s mother, A.A., as well as by M.A. and G.A. themselves, in videotaped statements. The statements were given on August 9, 2021 and August 10, 2021, and MILLER was formally charged with the offences described above on August 13, 2021.

11.     Under Canadian law, a person is formally charged with a crime when an Information is sworn before a justice (i.e., a Judge of the Ontario Court of Justice or a Justice of the Peace). The charge is formally instituted when a person, usually (but not necessarily) a peace officer, swears

- 4 -

under oath that he or she has reasonable and probable grounds to believe than an accused has committed the offence(s) set out in the Information. After an Information is sworn, a warrant for the arrest of the accused person may be issued where the Judge or Justice of the Peace is satisfied that a case for doing so is made out.

12.     In the present case, the charges outlined above were laid against MILLER by the swearing of an Information by Special Constable Elizabeth Pennington on August 13, 2021 before Her Worship, Justice of the Peace Louis Bourgon of the Ontario Court of Justice, Oshawa, Ontario. Attached as **Exhibit "A"** is a certified true copy of this Information. On August 13, 2021, Justice of the Peace Bourgon also issued a Warrant for the Arrest of MILLER on these charges. Attached as **Exhibit "B"** is a copy of this Arrest Warrant.

13.     I have reviewed DC Kavanagh's affidavit, the interview synopses for the two child complainants and their mother, and the Information and Arrest Warrant. Accordingly, I am familiar with the summary of the allegations and the DRPS investigation in this case. As a result, I believe that MILLER is charged with the offences alleged. I have been informed and I believe that MILLER has not yet been arrested or prosecuted in Canada in relation to any of the offences.

**C.     APPLICABLE LAW**

**i)  General Principles**

14.     The *Criminal Code* of Canada, Revised Statutes of Canada, 1985, chapter C-46, as amended, is a statute duly enacted by the Parliament of Canada containing the law relating to criminal offences and criminal procedure for the whole of Canada and every province thereof, including the Province of Ontario. The *Criminal Code* of Canada was in force at the time of the commission of the alleged offence and continues to be in force at the present time.

15.     The *Criminal Code* of Canada sets out definitions of offences, the maximum sentences possible for those offences, and sometimes a minimum sentence that must be imposed. In general, the provisions as they were worded at the time of the alleged offence are what would be applicable to a trial of these charges in Ontario.

- 5 -

16.     As a matter of Canadian constitutional law, provincial law officers of the Crown prosecute offences under the *Criminal Code* of Canada. In Ontario, the Ministry of the Attorney General of Ontario is responsible for such prosecutions.

17.     Under Canadian law, criminal offences are divided into three categories: (i) indictable offences, (ii) summary conviction offences and (iii) offences that are, at the election of the prosecution, either indictable or summary conviction. In general, indictable offences are more serious offences carrying more severe penalties. Summary conviction offences are generally considered to be less serious offences and carry less severe penalties. A hybrid offence is deemed to be indictable unless and until the Crown elects to proceed by way of summary conviction.

### ii)  Applicable *Criminal Code* of Canada Provisions

**Overview**

18.     In this case, the charges of sexual assault with a weapon and use of an imitation firearm while committing an indictable offence are indictable offences. The other offences are hybrid offences and therefore subject to the election of the prosecution as to whether to proceed by indictment or summary conviction. The Crown has not yet made an election in relation to the hybrid charges, however, according to Canadian law, hybrid offences are deemed to be indictable until the prosecution makes an election.

19.     The *Criminal Code* contains provisions which codify the offences with which MILLER has been charged. Those provisions, as they existed at the time of the alleged offences, duly enacted and proclaimed into force, will be applicable in the event of a trial and are set out below. The provisions continue to be in force in Canada.

**Sexual assault with a weapon**

20.     Sexual assault with a weapon is an indictable offence prohibited by section 272(1)(a) of the *Criminal Code.* The punishment, as stated in s. 272(2)(a.2) of the current version of the *Criminal Code* – in force at the time of the alleged offence – is a maximum of life imprisonment and a minimum of five years where the complainant is under the age of 16. The offence and

**MILLER_Ext_0051**

- 6 -

prescribed penalties are set out in the *Criminal Code* as follows:

> 272 (1) Every person commits an offence who, in committing a sexual assault,
> (a) carries, uses or threatens to use a weapon or an imitation of a weapon;
>
> *Punishment*
>
> (2) Every person who commits an offence under subsection (1) is guilty of an indictable offence and liable
>
> (a) if a restricted firearm or prohibited firearm is used in the commission of the offence or if any firearm is used in the commission of the offence and the offence is committed for the benefit of, at the direction of, or in association with, a criminal organization, to imprisonment for a term not exceeding 14 years and to a minimum punishment of imprisonment for a term of
>
>> (i) in the case of a first offence, five years, and
>>
>> (ii) in the case of a second or subsequent offence, seven years;
>
> (a.1) in any other case where a firearm is used in the commission of the offence, to imprisonment for a term not exceeding 14 years and to a minimum punishment of imprisonment for a term of four years; and
>
> (a.2) if the complainant is under the age of 16 years, to imprisonment for life and to a minimum punishment of imprisonment for a term of five years; and
>
> (b) in any other case, to imprisonment for a term not exceeding fourteen years.

21.  An offence contrary to section 272(1)(a) thus requires proof of a sexual assault coupled with the aggravating feature of the use of a weapon.

22.  The elements of a sexual assault are set out below under the heading "sexual assault".

23.  With respect to the use of a weapon, "weapon" is defined in section 2 of the *Criminal Code* as "any thing used, designed to be used or intended for use (a) in causing death to any person, or (b) for the purpose of threatening or intimidating any person and, without restricting the generality of the foregoing, includes a firearm and, for the purpose of sections 88, 267 and 272, any thing used, designed to be used or intended for use in binding or tying up a person against their will".

**Sexual Assault**

24.  Sexual assault is a hybrid offence prohibited by section 271 of the *Criminal Code*. Where

- 7 -

the prosecution proceeds by indictment, and the complainant(s) is/are under the age of 16, the *Criminal Code* stipulates that the accused is liable to imprisonment for up to 14 years.

25.     The offence and prescribed penalties are set out in the *Criminal Code* as follows:

> 271. (1) Everyone who commits a sexual assault is guilty of
> (a) an indictable offence and is liable to imprisonment for a term of not more than 10 years or, if the complainant is under the age of 16 years, to imprisonment for a term of not more than 14 years and to a minimum punishment of imprisonment for a term of one year; or
>
> (b) an offence punishable on summary conviction and is liable to imprisonment for a term of not more than 18 months or, if the complainant is under the age of 16 years, to imprisonment for a term of not more than two years less a day and to a minimum punishment of imprisonment for a term of six months.

26.     The offence of sexual assault is an assault as defined by s. 265(1) of the *Criminal Code* that is committed in circumstances of a sexual nature. Section 265 of the *Criminal Code* reads as follows:

> s. 265. (1) A person commits an assault when
>   (a) without the consent of another person, he applies force intentionally to that other person, directly or indirectly;
>   (b) he attempts or threatens, by an act or a gesture, to apply force to another person, if he has, or causes that other person to believe on reasonable grounds that he has, present ability to effect this purpose; or
>   (c) while openly wearing or carrying a weapon or an imitation thereof, he accosts or impedes another person or begs.
>
> (2) This section applies to all forms of assault, including sexual assault, sexual assault with a weapon, threats to a third party or causing bodily harm and aggravating sexual assault.
>
> (3) For the purposes of this section, no consent is obtained where the complainant submits or does not resist by reason of
>   (a) the application of force to the complainant or to a person other than the complainant;
>   (b) threats or fear of the application of force to the complainant or to a person other than the complainant;

**MILLER_Ext_0053**

- 8 -

    (c) fraud; or

    (d) the exercise of authority.

[…]

27.    An assault is thus the intentional application of force in the absence of consent. The force itself need not be violent; it can even be gentle, but it must be applied intentionally.

28.    As noted, an assault is a sexual assault when the force is applied in circumstances of a sexual nature.  More specifically, the Supreme Court of Canada has defined "sexual assault" as an assault committed in circumstances such that the sexual integrity of the victim is violated. The test to be applied in determining whether the conduct has the requisite sexual nature is objective. The court must determine whether the sexual or carnal context of the assault would be visible to a reasonable observer. The part of the body touched, the nature of the contact, the situation in which it occurred, the intent and purpose of the assault, the words, gestures, and threats accompanying the act, and all other circumstances surrounding the conduct are relevant.

29.    With respect to consent, under s. 150.1(1) of the *Criminal Code,* a victim under the age of 16 cannot provide legally valid consent.  Specifically, this section provides:

> 150.1 (1) Subject to subsections (2) to (2.2), when an accused is charged with an offence under section 151 or 152 or subsection 153(1), 160(3) or 173(2) or is charged with an offence under section 271, 272 or 273 in respect of a complainant under the age of 16 years, it is not a defence that the complainant consented to the activity that forms the subject-matter of the charge.

**Sexual Interference**

30.    Sexual interference is a hybrid offence prohibited by section 151 of the *Criminal Code.* The punishment, as stated in the version of the *Criminal Code* that was in force at the time of the alleged offences, is a maximum of fourteen years imprisonment if prosecuted by indictment. Section 151 of the *Criminal Code* reads as follows:

> 151. Every person who, for a sexual purpose, touches, directly or indirectly, with a part of the body or with an object, any part of the body of a person

- 9 -

under the age of 16 years

(a) is guilty of an indictable offence and is liable to imprisonment for a term of not more than 14 years and to a minimum punishment of imprisonment for a term of one year; or

(b) is guilty of an offence punishable on summary conviction and is liable to imprisonment for a term of not more than two years less a day and to a minimum punishment of imprisonment for a term of 90 days.

31.     Section 151 thus requires proof that the victim was under the age of 16 years, that the accused touched the victim, and that the touching was for a sexual purpose. Touching involves intentional physical contact with any part of the victim's body. The contact may be direct, for example, touching with a hand or other part of the body, or indirect, for example, touching with an object. Force is not required but an accidental touching is not enough.  Touching will be found to have been done for a sexual purpose if it is for the accused's sexual gratification or if it violates the victim's sexual integrity.

**Invitation to Sexual Touching**

32.     Section 152 of the *Criminal Code* provides for the offence of invitation to sexual touching. It is a hybrid offence.  The punishment, as stated in the version of the *Criminal Code* that was in force at the time of the alleged offences, is a maximum of fourteen years' imprisonment if prosecuted by indictment.

33.     The current version of s. 152 of the *Criminal Code,* which is the version applicable to the allegations against MILLER, reads as follows:

152. Every person who, for a sexual purpose, invites, counsels or incites a person under the age of 16 years to touch, directly or indirectly, with a part of the body or with an object, the body of any person, including the body of the person who so invites, counsels or incites and the body of the person under the age of 16 years,

(a) is guilty of an indictable offence and is liable to imprisonment for a term of not more than 14 years and to a minimum punishment of imprisonment for a term of one year; or

(b) is guilty of an offence punishable on summary conviction and is liable

- 10 -

to imprisonment for a term of not more than two years less a day and to a
minimum punishment of imprisonment for a term of 90 days.

34.    To obtain a conviction under this section, the prosecution must prove that the accused
invited, counselled, or incited the victim, who must be under the age of 16 at the time, to touch,
directly or indirectly, a part of his body or the body of another person.   As with the offence of
sexual interference, the contact could be direct, for example, touching a person with a hand or
other part of the body, or indirect, for example, touching a person with an object. Force
is not required but an accidental touching is not enough. Importantly, actual touching need not
occur.  The offence will be made out when the accused invited, counselled, or incited the victim
to touch the other person's body for a sexual purpose.

35.    The touching that is counselled or invited is done for a sexual purpose if it was done for
the accused's sexual gratification or for the purpose of violating the victim's sexual integrity.
When deciding what the purpose of the touching was, all of the circumstances surrounding the
touching should be considered.  The part of the body touched, the nature of the touching, and any
words said by the accused are all relevant.

**Uttering Threats**

36.    Threatening to cause bodily harm or death is prohibited by section 264.1(1)(a) of the
*Criminal Code*.  It is a hybrid offence.  Section 264.1(2), at present, and as applicable to the
allegations against MILLER, states that the maximum available sentence where the prosecution
proceeds by indictment is imprisonment for five years.  Specifically, ss. 264.1(1) and (2) read as
follows:

> 264.1 (1) Every one commits an offence who, in any manner, knowingly utters,
> conveys or causes any person to receive a threat
>
> (a) to cause death or bodily harm to any person;
>
> (b) to burn, destroy or damage real or personal property; or
>
> (c) to kill, poison or injure an animal or bird that is the property of any person.

- 11 -

*Punishment*

(2) Every one who commits an offence under paragraph (1)(a) is guilty of

(a) an indictable offence and liable to imprisonment for a term not exceeding five years; or

(b) an offence punishable on summary conviction.

37.    Whether an accused's words were actually a "threat", for the purpose of s. 264.1, is to be determined objectively.  Thus, the offence requires proof that a reasonable person, fully aware of the circumstances in which the words were uttered or conveyed, would perceive them to be a threat of death or serious bodily harm.  Conditional threats are not excluded.

38.    The person uttering the threat must intend that the recipient take the threat seriously.  The threat must be made knowingly and not merely recklessly.  The determination as to whether there was a subjective intent will often be largely based upon the words used by the accused.  However, the intended recipient of the threat need not actually take the threat seriously, or be intimidated by it.  And the person uttering the threat need not have the intention to carry it out.

39.    To determine whether the accused intended the threat to be taken seriously, the court can consider the context in which the statements were made, and their effect on the recipient.

**Possession of a weapon for the purpose of committing an offence**

40.    Possessing a weapon for a dangerous purpose <u>or</u> for the purpose of committing an offence is an offence under s. 88 of the *Criminal Code*.  The punishment, where the Crown proceeds by indictment, includes a sentence of up to 10 years imprisonment.  Specifically, sections 88(a) and (b) read:

> 88 (1) Every person commits an offence who carries or possesses a weapon, an imitation of a weapon, a prohibited device or any ammunition or prohibited ammunition for a purpose dangerous to the public peace or for the purpose of committing an offence.
>
> *Punishment*
>
> (2) Every person who commits an offence under subsection (1)

- 12 -

(a) is guilty of an indictable offence and liable to imprisonment for a term not exceeding ten years; or

(b) is guilty of an offence punishable on summary conviction.

41.     As noted above, section 2 of the *Criminal Code* sets out the definition of a "weapon".  The definition includes "any thing used, designed to be used or intended for use (a) in causing death to any person, or (b) for the purpose of threatening or intimidating any person and, without restricting the generality of the foregoing, includes a firearm and, for the purpose of sections 88, 267 and 272, any thing used, designed to be used or intended for use in binding or tying up a person against their will".

42.     In MILLER's case, he is charged under s. 88 for possessing a weapon "for the purpose of committing an offence".  This offence requires proof of possession by an accused of the weapon, coupled with a subjective *intention* on the part of the accused to commit an offence.  It is not necessary for the prosecution to prove an intention to commit any *particular* offence; any offence is sufficient.

**Use of an imitation firearm while committing an indictable offence**

43.     Using an imitation firearm to commit an indictable offence is a distinct criminal offence under s. 85(2)(a) of the *Criminal Code.*   The offence is straight indictable.   The maximum punishment for a first offender is 14 years imprisonment and there is a mandatory minimum sentence of one year imprisonment.

44.     Sections 85(2) and (3) read as follows:

(2) Every person commits an offence who uses an imitation firearm

(a) while committing an indictable offence,

(b) while attempting to commit an indictable offence, or

(c) during flight after committing or attempting to commit an indictable offence,

whether or not the person causes or means to cause bodily harm to any person as a result of using the imitation firearm.

*Punishment*

- 13 -

(3) Every person who commits an offence under subsection (1) or (2) is guilty of an indictable offence and liable

(a) in the case of a first offence, except as provided in paragraph (b), to imprisonment for a term not exceeding fourteen years and to a minimum punishment of imprisonment for a term of one year; and

(b) in the case of a second or subsequent offence, to imprisonment for a term not exceeding 14 years and to a minimum punishment of imprisonment for a term of three years.

45.     The offence of using an imitation firearm to commit an indictable offence requires proof that the accused "used" the imitation firearm while committing the underlying offence.  The underlying offence must be proven.  In MILLER's case, the underlying offence he is alleged to have committed while using an imitation firearm is invitation to sexual touching, contrary to s. 152 (see above).

46.     An accused "uses" an imitation firearm for the purpose of s. 88 when the imitation firearm is used to facilitate the underlying offence or to escape.  The accused must possess the imitation firearm or have it readily at hand during the commission of the underlying offence.  Use is established where the accused points, discharges, or displays the firearm to facilitate the offence through intimidation.  Mere possession is not sufficient.  Nor can the offence be proven by threats of using an imitation firearm in the absence of possession.

**D.     OPINION**

47.     In Canada, in order to find an accused guilty of an offence contrary to the *Criminal Code*, the trier of fact must be satisfied that the guilt of the accused has been established beyond a reasonable doubt.  A trier of fact (a judge or jury) may be satisfied of an accused's guilt beyond a reasonable doubt, and convict, solely on the basis of testimony from a victim that is reasonably believed.  Independent corroboration of a victim's evidence is not required.

48.     I have read and reviewed the Information charging the accused, MILLER, with sexual assault with a weapon; sexual assault (x3); sexual interference (x4); utter threat to cause death; invitation to sexual touching (x2); possession of a weapon for the purpose of committing an offence (x2); and use of an imitation firearm while committing an indictable offence.  I have

- 14 -

reviewed the August 13, 2021 warrant for his arrest. I have also reviewed the affidavit of DC Kavanagh. I have also reviewed synopses of the interviews of the alleged victims prepared by DRPS.

49.     I have also considered that Canadian law recognizes that an accused's after-the-fact conduct may be circumstantial evidence of guilt. Here, the accused decided to quickly leave the country after being confronted with allegations of sexual offending against M.A. and G.A. In my opinion, this is circumstantial evidence the prosecution could seek to have admitted as evidence going to the live issue of whether the accused committed the offences alleged.

50.     Ultimately, in my opinion, the evidence disclosed in the affidavit of DC Kavanagh establishes a *prima facie* case that MILLER is guilty of the offences with which he is charged. That is to say, a reasonable jury, properly instructed on the applicable law could, on the available evidence, find beyond a reasonable doubt that MILLER is guilty of the offences he is alleged to have committed against these victims.

51.     More specifically, with respect to the charge of sexual assault with a weapon, a reasonable jury, properly instructed on the law, could accept the evidence of M.A. that the accused used a knife to threaten him while committing a sexual assault on him. The absence of corroborating DNA evidence of the sexual assault does not make a finding of guilt on this count unreasonable, given the timeline. The swabs were taken days after the incidents were first described. Nor does the absence of corroborating evidence from the second alleged victim, G.A. Moreover, a knife clearly satisfies the definition of "weapon" in s. 2 of the *Criminal Code*.

52.     With respect to the three charges of sexual assault *simpliciter* (two relating to G.A. and one relating to M.A.), a reasonable jury, properly instructed, could accept the evidence of the victims describing sexual contact by MILLER and convict. Given the victim's ages, consent will not be an issue that must be decided. With respect to the count relating to M.A., in his statements M.A. said that MILLER assaulted him 6-7 times. He also described an incident where MILLER directed G.A. to sexually assault M.A. As for the two counts relating to G.A., M.A. described an incident where he witnessed MILLER sexually assaulting G.A. by fondling him and then anally penetrating

- 15 -

him. G.A., in his statement, described a separate incident where MILLER sexually assaulted him by touching his genitals while he was lying in his father's bed. These facts, if accepted by a jury, establish sexual assaults by MILLER.

53.     The facts described by G.A. and M.A. that make out the offence of sexual assault x3 and sexual assault with a weapon also make out the offence of sexual interference by MILLER. The victims are under the age of 16. The touching was intentional and for a sexual purpose.

54.     As for the charge of uttering a threat to cause death, M.A.'s statement that MILLER told him "don't tell mom or I'll kill you" and his statement that this scared him, provide a basis to conclude that a reasonable jury, properly instructed on the law, could convict MILLER on the basis of M.A.'s anticipated evidence. These words were spoken to intimidate the victim. A knife was used. In these circumstances, it will be open to a jury to find that a reasonable person, fully aware of the circumstances in which the words were uttered or conveyed, would perceive them to be a threat of death or serious bodily harm, intended to be taken seriously.

55.     The two charges of invitation to sexual touching are made out on the facts from M.A.'s second interview wherein he states that MILLER forced M.A. to touch G.A.'s penis and forced G.A. to touch M.A.'s penis. The offence of sexual touching does not require that the accused be the subject of the sexual touching. The offence prohibits inviting, counselling, or inciting a victim under the age of 16 to touch "the body of any person" for a sexual purpose. A reasonable, properly instructed jury could, on the basis of M.A.'s evidence, find that MILLER counselled the victims to engage in sexual touching for a sexual purpose.

56.     The two charges of possession of a weapon for the purpose of committing an offence are made out by the facts described by M.A. in his first and second interviews. As noted, M.A. described sexual assaults involving a knife, and sexual assaults and invitations to sexual touching involving a BB gun. When used to threaten a person, both a knife and a BB gun meet the definition of "weapon" as defined by s. 2 of the *Criminal Code*. A reasonable, properly instructed jury could find that MILLER possessed these weapons with the subjective intention of committing the offences of sexual assault and invitation to sexual touching.

- 16 -

57.     Finally, the offence of use of an imitation firearm while committing an indictable offence is made out by the statement by M.A. that MILLER threatened M.A. and G.A. with a BB gun while committing the indictable offence of invitation to sexual touching.

58.     A BB gun, which is an air powered gun that shoots round metal "BB" projectiles, can qualify as an imitation firearm.  Section 84(1) of the *Criminal Code* defines imitation firearms as "any thing that imitates a firearm, and includes a replica firearm".  Firearm, in turn, is defined in s. 2 of the *Criminal Code* as "a barrelled weapon from which any shot, bullet or other projectile can be discharged and that is capable of causing serious bodily injury or death to a person, and includes any frame or receiver of such a barrelled weapon and anything that can be adapted for use as a firearm".  Importantly, under Canadian law (*R. v. Scott,* 2000 BCCA 220, affirmed by the Supreme Court of Canada, *R. v. Scott,* 2001 SCC 73) a thing alleged to be an "imitation firearm" is not precluded from being found to be an imitation firearm if it also meets the criteria of a "firearm".

59.     A reasonable jury, properly instructed on the law, could find MILLER guilty of this offence if it found him guilty of the predicate offence of invitation to sexual touching and found that the BB gun met the criteria of "imitation firearm".

60.     The fact that A.A. looked for the BB gun in the house, after M.A. and G.A.'s disclosures, and did not find it does not preclude a reasonable finding of guilt on this charge, or the possession charge relating to the BB gun.  A.A. and her husband advised police that they believed MILLER had a BB gun.  Further, MILLER was confronted on August 7 but A.A. did not look for the BB gun until the night of August 10.  There was time for MILLER to hide the BB gun, and it is possible he took it with him when he left.

**E.     OTHER ISSUES**

61.     In Canada there is no statutory limitation period of general application in respect of instituting proceedings for indictable offences or hybrid offences prosecuted by indictment – although there is a six-month limitation period for instituting proceedings for summary conviction offences.  For "hybrid" offences, which are either indictable or summary conviction at the election

- 17 -

of the prosecution, no limitation period applies if the prosecution elects to proceed by indictment, but a six-month limitation period would apply (subject to an accused consenting to its waiver) if the prosecution elects to proceed by way of summary conviction.

62.     In the case of MILLER, there are also no specific limitations pertaining to the charges that have been laid against him. Further, the prosecuting Crown's office has advised that the offences charged against MILLER will be prosecuted as indictable offences. Therefore, in Canadian law, there is no time limit on the institution of proceedings for the offences with which MILLER is charged.

63.     While there is no time limit on the *institution* of proceedings in respect of indictable offences, there is a limit on the time in which an accused may be prosecuted in Canada. Pursuant to jurisprudence from the Canadian Supreme Court, the prosecution has 30 months to prosecute an accused in the Superior Court of Justice, which tries indictable offences, and 18 months to prosecute accused persons in Provincial Court, which tries both indictable and summary matters. These ceilings are subject to exceptions when there is delay caused by the accused or by exceptional circumstances.

64.     The offences for which MILLER has been charged are not of a political character. I am also of the opinion that the charges have not been laid against MILLER for the purpose of prosecuting him on account of his race, tribe, nationality, religion, sex, or political opinion, and that, if returned to Canada, he will not be prejudiced by reason of his race, tribe, nationality, religion, sex, or political opinion.

## F.     CONCLUSION

65.     I am of the opinion that these offences are properly triable in the Province of Ontario, and that the criminal courts in the Province of Ontario have jurisdiction to try MILLER for these offences.

66.     This affidavit is made in good faith in support of a request by Canada for the extradition of MILLER so that he may be prosecuted on all fourteen counts noted above, and for no improper purpose.

- 18 -

SWORN BEFORE ME at the City        )
of Toronto in the Toronto Region   )
in the Province of Ontario, Canada,)
this **6** day of June, 2022.      )      _____
                                   )        Andrew Hotke

_____
Barrister & Solicitor
& Commissioner of Oaths

LSO 66060D
Kevin Rawluk

MILLER_Ext_0064

**HER MAJESTY THE QUEEN**

**v.**

**JIMMY MILLER**

IN THE MATTER of a request by Canada for the
extradition of JIMMY MILLER from the United
States of America with respect to offences under
the *Criminal Code* of Canada.

===================

**AFFIDAVIT OF ANDREW HOTKE**

===================

MINISTRY OF THE ATTORNEY GENERAL
FOR THE PROVINCE OF ONTARIO
Crown Law Office - Criminal
720 Bay Street, 10th Floor
TORONTO, Ontario
M7A 2S9

**MILLER_Ext_0065**

THIS IS EXHIBIT **"A"**  TO THE AFFIDAVIT OF

_____Andrew Hotke_____  SWORN BEFORE ME

THIS  **6th**  DAY OF June, 2022

_____
A COMMISSIONER, ETC.

Kevin Rawluk
LSO 66060D

DURHAM REGIONAL POLICE SERVICE
OCC#: 21-185821 Inv.Off.:3363

Police Case ID#: 203047

### Information / Dénonciation
Form 2, sections 506, 508.1 and 788 / Formule 2, articles 506, 508.1 et 788

☐ IPV (Intimate Partner Violence / Violence contre un partenaire intime)

☐ S (Impaired driving with substances / Conduite avec capacités affaiblies par des substances)

☐ V (Vessel / Bateau)

**21-A36664**
Information Number / N° de la dénonciation

☐ Replacement Information / Dénonciation de remplacement

☐ Non-Disclosure Order Pursuant to s. 486.31
Ordonnance de non-divulgation, art. 486.31

☐ Non-communication s. 515(12)/516(2)
Non-communication, par. 515 (12)/516 (2)

☐ Publication ban pursuant to
Interdiction de publication en vertu de

☐ Provisions of 530(3) complied with
Dispositions du par. 530 (3) observées

| Arrest Date:<br>Date d'arrestation | 15 month Flag:<br>Alerte à 15 mois | 18 month Flag:<br>Alerte à 18 mois |
|---|---|---|
| Sworn/Affirmed Date /<br>Deemed Sworn/Affirmed Date: Aug 13th 2021<br>Déclarée sous serment/affirmée solennellement le / réputée<br>être déclarée sous serment/affirmée solennellement le | 15 month Flag:<br>Alerte à 15 mois | 18 month Flag:<br>Alerte à 18 mois |

CANADA
PROVINCE OF ONTARIO
PROVINCE DE L'ONTARIO

CENTRAL EAST
(Region / Région)

E PENNINGTON 1870

Information of: _____
Dénonciation de :

of   REGION OF DURHAM                    PEACE OFFICER
de                                        (occupation / profession)

hereinafter called the informant. / ci-après appelé(e) le dénonciateur.

The informant says that they believe on reasonable grounds that
Le dénonciateur déclare qu'il a des motifs raisonnables de croire que

(1) MILLER, Jimmy    DOB: 09 Nov. 2000    DL:
    42 LAHAYE DR, WHITBY, ONT

COUNT 1

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year
2021 at the Town of Whitby in the Central East Region did, in committing a sexual
assault on M█████ A█████ use a weapon, namely a knife, contrary to Section 272,
subsection (1), clause (a) of the Criminal Code of Canada.

Continued...

CERTIFIED TO BE A TRUE AND CORRECT
COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFIÉE ET
CONFORME À L'ORIGINAL
DATED/FAIT LE _____

CLERK OF THE COURT / GREFFIER DE LA COUR
ONTARIO COURT OF JUSTICE
COUR DE JUSTICE DE L'ONTARIO



Generated Date: August 13, 2021 07:28 AM

CCO-Z-000-1-C (rev. 12/19)

**MILLER_Ext_0067**

(Charges Continued / *Accusations, suite*)

COUNT 2 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, with a part of his body, for a sexual purpose, directly or indirectly touch the body of a person under the age of sixteen years, namely M███ A███ contrary to Section 151 of the Criminal Code of Canada.

COUNT 3 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did commit a sexual assault on M███ A███ contrary to Section 271 of the Criminal Code of Canada.

COUNT 4 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, with a part of his body, for a sexual purpose, directly or indirectly touch the body of a person under the age of sixteen years, namely M███ A███ contrary to Section 151 of the Criminal Code of Canada.

COUNT 5 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did commit a sexual assault on G███ A███ contrary to Section 271 of the Criminal Code of Canada.

COUNT 6 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, with a part of his body, for a sexual purpose, directly or indirectly touch the body of a person under the age of sixteen years, namely G███ A███ contrary to Section 151 of the Criminal Code of Canada.

Continued...

CCO-2-000-1-C (rev. 12/19)

**MILLER_Ext_0068**

(Charges Continued / *Accusations, suite*)

COUNT 7 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did commit a sexual assault on G███████ A██████ contrary to Section 271 of the Criminal Code of Canada.

COUNT 8 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, with a part of his body, for a sexual purpose, directly or indirectly touch the body of a person under the age of sixteen years, namely G███████ A██████ contrary to Section 151 of the Criminal Code of Canada.

COUNT 9 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, by word of mouth, knowingly utter a threat to cause death to M███████ A██████ contrary to Section 264.1, subsection (1), clause (a) of the Criminal Code of Canada.

COUNT 10 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, for a sexual purpose, counsel, a person under the age of sixteen years, namely M███████ A██████ to directly or indirectly touch with a part of his body and touch the body of G███████ A██████ contrary to Section 152 of the Criminal Code of Canada.

COUNT 11 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, for a sexual purpose, counsel, a person under the age of sixteen years, namely G███████ A██████ to directly or indirectly touch with a part of his body and touch the body of M███████ A██████, contrary to Section 152 of the Criminal Code of Canada.

Continued...

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFIÉE ET CONFORME À L'ORIGINAL
DATED/FAIT LE _____

CLERK OF THE COURT / GREFFIER DE LA COUR
ONTARIO COURT OF JUSTICE
COUR DE JUSTICE DE L'ONTARIO

CCO-2-000-1-C (rev. 12/19)

MILLER_Ext_0069

(Charges Continued / *Accusations, suite*)

COUNT 12 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year
2021 at the Town of Whitby in the Central East Region did possess a weapon, namely a
knife, for the purpose of committing an offence, contrary to Section 88, subsection
(1) of the Criminal Code of Canada.

COUNT 13 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year
2021 at the Town of Whitby in the Central East Region did possess a weapon, namely a
BB gun, for the purpose of committing an offence, contrary to Section 88, subsection
(1) of the Criminal Code of Canada.

COUNT 14 AND FURTHER THAT

Jimmy MILLER

between the 31st day of March in the year 2021 and the 8th day of August in the year
2021 at the Town of Whitby in the Central East Region did use an imitation firearm,
namely an imitation a BB gun, while committing an indictable offence under Section 152
of the Criminal Code, contrary to Section 85, subsection (2), clause (a) of the
Criminal Code of Canada.

MILLER_Ext_0070

**21-A36664**

Information Number / N° de la dénonciation

☒ Deemed to be sworn/affirmed – To be completed where information is laid other than in person:
*Réputée être déclarée sous serment/affirmée solennellement – À remplir lorsque la dénonciation est déposée autrement qu'en personne :*

I,     **E PENNINGTON 1870**                          , state that all matters contained in this information are true to my knowledge and
*Je soussigné(e)     (name of informant / nom du dénonciateur)      déclare que tous les renseignements contenus dans la présente dénonciation*

belief, pursuant to s. 508.1(2) of the *Criminal Code*.
*sont, à ma connaissance, véridiques, en vertu du par. 508.1 (2) du Code criminel.*

Dated at     **CITY of OSHAWA**            in the Province of Ontario, this     **13th**  day of  **AUGUST**         , 20 **21**
*Fait à(au)                                dans la province de l'Ontario, ce        jour de*

☐ To be completed where information is laid in person:
*À remplir lorsque la dénonciation est déposée en personne :*

Sworn/affirmed before me at the _____
*Déclarée sous serment/affirmée solennellement devant moi à/au*

of / de _____

In the Province of Ontario / dans la province de l'Ontario

this _____ day of

ce _____ jour de _____, 20 _____

Elizabeth Pennington EA (M)    Digitally signed by Elizabeth Pennington EA (M)
DN: c=CA, st=on, o=Government of Ontario, ou=GO-PKI, ou=OPP-CA, ou=OLA, ou=Durham Reg PF, cn=Elizabeth Pennington EA (M)
Date: 2021.08.13 08:49:52 -04'00'

_____
Informant / Dénonciateur

_____
Justice of the Peace / Juge de paix

☐ Appearance Notice      ☐ Undertaking      ☐ Release Order          for _____ , 20 ____
*Citation à comparaître        Promesse          Ordonnance de mise en liberté       pour le    (day, month / jour, mois)*

CHECK ONE OF THE FOLLOWING / *COCHEZ LA CASE QUI CONVIENT*

☐ Cancelled – Police to notify defendant        ☐ Cancelled – Summons          ☐ Confirmed on _____ , 20 ____
*Annulé(e) – La police informera la partie défenderesse   Annulé –Sommation           Confirmé(e) le    (day, month / jour, mois)*

☐ Cancelled – Warrant Issued _____
*Annulé(e) – Mandat délivré*

_____ , 20 ____
Justice of the Peace / Juge de paix    (day, month / jour, mois)

_____
Justice of the Peace / Juge de paix

| Date Data | Crown Elects to Proceed *La Couronne choisit de procéder par* | ☐ Summarily *Procédure sommaire* | ☐ By Indictment *Acte d'accusation* | ☐ Summary Conviction Offence(s) *Infraction(s) punissable(s) sur déclaration de culpabilité par procédure sommaire* | | ☐ Indictable Offence(s) *Acte(s) criminel(s)* | |
|---|---|---|---|---|---|---|---|

| Date Date | Accused Accusé | Elects Trial by *Choix d'un procès devant* | | | | | Preliminary Hearing Requested *Enquête préliminaire demandée* | | Justice Initials *Initiales du juge* | Abs. Juris. Comp. absolue | Pleads *Plaide* | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Superior Court *Cour supérieure* | | Ontario Court *Cour de l'Ontario* | | | Yes Oui | No Non | | | Guilty to Counts *Coupable des chefs d'accusation* | Not Guilty to Counts *Non coupable des chefs d'accusation* |
| | | Judge Juge | Judge & Jury *Juge et jury* | Judge On Counts *Juge pour les chefs d'accusation* | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

| Date Date | Accused Accusé | Committed (or) Ord. Std. Trial *On Counts Renvoyé à procès *pour les chefs d'accusation* | Discharged on Counts *Libéré des chefs d'accusation* | Found / Reconnu | |
|---|---|---|---|---|---|
| | | | | Guilty on Counts *Coupable des chefs d'accusation* | Not Guilty on Counts *Non coupable des chefs d'accusation* |
| | | | | | |
| | | | | | |
| | | | | | |

*☐ With consent of accused and prosecutor, without taking or recording        ☐ (a) any evidence    (or)    ☐ (b) further evidence
*Avec le consentement de l'accusé et du poursuivant, sans recueillir ou consigner        a) des preuves    (ou)    b) des preuves additionnelles*

_____
Judge / Juge

CCO-2-000-1-C (rev. 12/19)

**MILLER_Ext_0071**

21-A36664

Information Number / N° de la dénonciation

☐ Accused notified court under s. 530(3) _____
Tribunal avisé par l'accusé en vertu du par. 530 (3)

☐ Designation Filed
Désignation déposée

☐ Interpreter Required _____
Interprète requis

| Date | Accused<br>Accusé | Adjournment Date<br>Date d'ajournement | Adjournment Details<br>Détails sur l'ajournement | Designation<br>Désignation | Counsel As Agent<br>Avocat comparaître | Fails to Appear<br>Omet de comparaître | Bench Warrant<br>Mandat d' arrêt | Discretion<br>Discrétion | Certificate of Default<br>Certificat de défaut |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Date<br>Date | Clerk<br>Greffier | Crown<br>Couronne | For the Accused<br>Pour l'accusé | Justice's<br>initials<br>Inifiales du<br>juge |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CERTIFIED TO BE A TRUE AND CORRECT
COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFIÉE ET
CONFORME À L'ORIGINAL
DATED/FAIT LE _____
CLERK OF THE COURT / GREFFIER DE LA COUR
ONTARIO COURT OF JUSTICE
COUR DE JUSTICE DE L'ONTARIO

At Bail Review dated _____
À la révision de l'ordonnance
de détention datée du

☐ Original Order
Confirmed
Ordonnance
originale confirmée

☐ New Order
Made
Nouvelle
ordonnance
rendue

☐ Gladue Report
Requested
Rapport Gladue
demandé _____ (date / date)

CCO-2-000-1-C (rev. 12/19)

MILLER_Ext_0072

CANADA
PROVINCE OF ONTARIO / PROVINCE DE L'ONTARIO
Central East Region (Durham Courthouse)

Information No.

This Information is received and is ☑ accepted on its face
☐ rejected

| Accused Person | | Judicial Decision |
| --- | --- | --- |
| JIMMY MILLER (2000-11-09) | Requesting Warrant | Warrant Issued |

Provide reason for cancelling or not issuing process or any additional comment in this field

Signed in the Province of Ontario
Signé dans la province de l'Ontario

Louis Bourgon
2021.08.13 10:18:35 -04'00'

Justice of the Peace / Juge de paix



CERTIFIED TO BE A TRUE AND CORRECT
COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFIÉE ET
CONFORME À L'ORIGINAL
DATED/FAIT LE

CLERK OF THE COURT / GREFFIER DE LA COUR
ONTARIO COURT OF JUSTICE
COUR DE JUSTICE DE L'ONTARIO

This document has been digitally signed / ce document a été signé numériquement

MILLER_Ext_0073

Regina v. / La Reine c. _____  Information No. / Nᵒ de la dénonciation

**21-A36664**

## Count / Chef _____ Sentence date / Date de détermination de la peine _____ ☐ Withdrawn / Accusation retirée

☐ Pre-sentence custody _____ days/months  Time credited: _____ days/months  ☐ concurrent with _____
   Détention présentencielle _____ jours/mois  Crédit octroyé _____ jours/mois  concurrente avec
☐ Term that would have been imposed before credit granted: _____ days/months/years
   Période d'emprisonnement imposée avant l'octroi de tout crédit _____ jours/mois/ans
☐ Absolute discharge ☐ Conditional discharge ☐ Suspended sentence
   Absolution inconditionnelle  Absolution conditionnelle  Condamnation avec sursis
☐ Imprisoned for _____ days/months/years ☐ concurrent with ☐ consecutive to _____
   Emprisonnement pour  jours/mois/ans  concurrent avec  consécutive à
☐ Intermittent sentence for _____ days ☐ concurrent with ☐ consecutive to _____
   Peine discontinue  jours  concurrent avec  consécutive à
☐ Conditional sentence for _____ days/months/years ☐ concurrent with ☐ consecutive to _____
   Ordonnance de sursis  jours/mois/ans  concurrent avec  consécutive à
☐ Probation _____ months/years ☐ concurrent with ☐ consecutive to _____
   Période de probation  mois/ans  concurrente avec  consécutive à
☐ Community service s.732.1(3)(f) / Service communautaire, par.732.1 (3)f) _____ hours / heures
☐ Fine of $ _____ VS $ _____ Time to pay _____
   Amende de  $ sur. comp.  délai de paiement
☐ Restitution ☐ s. 738 / s. 739  Amount: $ _____ Time to pay _____
   Dédommagement  art. 738 / art. 739  Montant $  Délai de paiement
☐ Victim surcharge: $ _____ Time to pay: _____
   Suramende compensatoire  $  Délai de paiement

☐ Dismissed ☐ HTA cautioned ☐ Driving prohibition: _____ Months / Years ☐ s.743.21(1) / par. 743.21 (1)
  Rejeté   Avertissement (Code de la route)  Interdiction de conduite :  mois/années
☐ Acquitted ☐ Weapons prohibition: ☐ s. 109(2): _____ years ☐ s. 109(3) (Life) ☐ s. 110: _____ years ☐ s. 110 (life)
  Acquitté   Interdiction d'armes  par. 109 (2)  ans  par.109 (3)(perpétuité)  art. 110  ans  art .110 (perpétuité)
☐ Stayed ☐ DNA: ☐ 5.03 (Primary) ☐ 5.04 (Secondary) ☐ Denied (DND)
  Sursis   ADN  5.03 (primaire)  5.04 (secondaire)  Rejetée
☐ In Absentia ☐ S.O.I.R.A. order: ☐ 10 years ☐ 20 years ☐ Life
  In absentia   Ordonnance LERDS  10 ans  20 ans  Perpétuité
☐ Other ☐ s. 161 prohibition: _____ months/years ☐ s. 490 forfeiture order: ☐ Granted ☐ Denied
  Autre   Interdiction, art. 161  mois/ans  Ordonnance de confiscation, art. 490  Accordée  Rejetée

## Count / Chef _____ Sentence date / Date de détermination de la peine _____ ☐ Withdrawn / Accusation retirée

☐ Pre-sentence _____ days/months  Time credited: _____ days/months  ☐ concurrent with _____
   Détention présentencielle _____ jours/mois  Crédit octroyé _____ jours/mois  concurrente avec
☐ Term that would have been imposed before credit granted: _____ days/months/years
   Période d'emprisonnement imposée avant l'octroi de tout crédit _____ jours/mois/ans
☐ Absolute discharge ☐ Conditional discharge ☐ Suspended sentence
   Absolution inconditionnelle  Absolution conditionnelle  Condamnation avec sursis
☐ Imprisoned for _____ days/months/years ☐ concurrent with ☐ consecutive to _____
   Emprisonnement pour  jours/mois/ans  concurrent avec  consécutive à
☐ Intermittent sentence for _____ days ☐ concurrent with ☐ consecutive to _____
   Peine discontinue  jours  concurrent avec  consécutive à
☐ Conditional sentence for _____ days/months/years ☐ concurrent with ☐ consecutive to _____
   Ordonnance de sursis  jours/mois/ans  concurrent avec  consécutive à
☐ Probation _____ months/years ☐ concurrent with ☐ consecutive to _____
   Période de probation  mois/ans  concurrente avec  consécutive à
☐ Community service s.732.1(3)(f) / Service communautaire, par.732.1(3)f) _____ hours / heures
☐ Fine of $ _____ VS $ _____ Time to pay _____
   Amende de  $ sur. comp.  Délai de paiement
☐ Restitution ☐ s. 738 / s. 739  Amount: $ _____ Time to pay _____
   Dédommagement  art. 738 / art. 739  Montant $  Délai de paiement
☐ Victim surcharge: $ _____ Time to pay: _____
   Suramende compensatoire  $  Délai de paiement

☐ Dismissed ☐ HTA cautioned ☐ Driving prohibition: _____ Months / Years ☐ s.743.21(1) / par. 743.21(1)
  Rejeté   Avertissement (Code de la route)  Interdiction de conduite :  mois/années
☐ Acquitted ☐ Weapons prohibition: ☐ s. 109(2): _____ years ☐ s. 109(3) (Life) ☐ s. 110: _____ years ☐ s. 110 (life)
  Acquitté   Interdiction d'armes  par. 109(2)  ans  par.109(3)(perpétuité)  art. 110  ans  art.110 (perpétuité)
☐ Stayed ☐ DNA: ☐ 5.03 (Primary) ☐ 5.04 (Secondary) ☐ Denied (DND)
  Sursis   ADN  5.03 (primaire)  5.04 (secondaire)  Rejetée
☐ In Absentia ☐ S.O.I.R.A. order: ☐ 10 years ☐ 20 years ☐ Life
  In absentia   Ordonnance LERDS  10 ans  20 ans  Perpétuité
☐ Other ☐ s. 161 prohibition: _____ months/years ☐ s. 490 forfeiture order: ☐ Granted ☐ Denied
  Autre   Interdiction, art. 161  mois/ans  Ordonnance de confiscation, art. 490  Accordée  Rejetée

_____  _____
Justice of the Peace / Juge de paix  Judge / Juge

CCO-2-000-1-C (rev. 12/19)

**MILLER_Ext_0074**

Information No. / N° de la dénonciation
21-A36664

Return Date / Date à laquelle le document est rapporté
,20

INFORMATION Against / DÉNONCIATION visant
MILLER, Jimmy

Address / Adresse
42 LARHYE DR
WHITBY, ONT

CHARGE / ACCUSATION
SEXUAL ASSAULT WITH WEAPON OR IMITATION WEAPON
SEXUAL INTERFERENCE WITH A PERSON UNDER 16 YEARS
SEXUAL ASSAULT
Refer to front page for further counts. / Reportez-vous à la première page pour plus de chefs.

| FOR ADMINISTRATIVE PURPOSES ONLY À DES FINS ADMINISTRATIVES SEULEMENT | | |
|---|---|---|
| ☐ Summons / Sommation | ☐ Show Cause / Audience de justification | ☒ Warrant 1st / Mandat en 1re instance |
| ☐ Replacement Information / Dénonciation de remplacement | | |
| ☐ Reportable M.V. Offence (H.T.A. 199) / Infraction V.A. à déclarer (Code de la route 199) | ☐ C.V.O.R. No (Commercial Vehicles Only) / Numéro C.I.U.V.U. (véhicules utilitaires seulement) | |

| Sex / Sexe M / F | Birth Date / Date de naissance | | | Was defendant owner? La partie défenderesse était-elle propriétaire? | Involves a Collision Infraction reliée à un accident |
|---|---|---|---|---|---|
| | Day / Jour | Month / Mois | Year / Année | | |
| M | 09 | 11 | 2000 | ☐ Yes/Oui ☐ No/Non | |

Driver's Licence Number / Numéro du permis de conduire

Plate No. / Numéro de plaque ☐

Informant / Dénonciateur
E PENNINGTON 1870

Date Sworn/Affirmed / Déclaré sous serment/affirmé solennellement le AUG 13 ,21

Date of Arrest / Date de l'arrestation

☒ Deemed to be sworn/affirmed / Réputée être déclarée sous serment/affirmée solennellement le

Officer / Agent de police
KAVANAGH, JENNI

No. / N°
3363

Police Agency / Service de police
DURHAM REGIONAL POLIC

Div. / Dist.
MCU — SEXUAL AS

Occurrence Number / N° d'incident
21-1185821

Courtroom / Salle d'audience

At / À(au) ADULT INTAKE / SET DATE COURT
150 BOND STREET EAST, OSHAWA, ONTARIO

CCO-2-0001-I-C (rev. 12/19)

---

Information No. / N° de la dénonciation

Return Date / Date à laquelle le document est rapporté
,20

INFORMATION Against / DÉNONCIATION visant

Address / Adresse

CHARGE / ACCUSATION

Refer to front page for further counts. / Reportez-vous à la première page pour plus de chefs.

| FOR ADMINISTRATIVE PURPOSES ONLY À DES FINS ADMINISTRATIVES SEULEMENT | | |
|---|---|---|
| ☐ Summons / Sommation | ☐ Show Cause / Audience de justification | ☐ Warrant 1st / Mandat en 1re instance |
| ☐ Replacement Information / Dénonciation de remplacement | | |
| ☐ Reportable M.V. Offence (H.T.A. 199) / Infraction V.A. à déclarer (Code de la route 199) | ☐ C.V.O.R. No (Commercial Vehicles Only) / Numéro C.I.U.V.U. (véhicules utilitaires seulement) | |

| Sex / Sexe M / F | Birth Date / Date de naissance | | | Was defendant owner? La partie défenderesse était-elle propriétaire? | Involves a Collision Infraction reliée à un accident |
|---|---|---|---|---|---|
| | Day / Jour | Month / Mois | Year / Année | | |
| | | | | ☐ Yes/Oui ☐ No/Non | |

Driver's Licence Number / Numéro du permis de conduire

Plate No. / Numéro de plaque ☐

Informant / Dénonciateur

Date Sworn/Affirmed / Déclaré sous serment/affirmé solennellement le

Date of Arrest / Date de l'arrestation

☐ Deemed to be sworn/affirmed / Réputée être déclarée sous serment/affirmée solennellement le

Officer / Agent de police

No. / N°

Police Agency / Service de police

Div. / Dist.

Occurrence Number / N° d'incident

Courtroom / Salle d'audience

At / À(au)

---

Information No. / N° de la dénonciation

Return Date / Date à laquelle le document est rapporté
,20

INFORMATION Against / DÉNONCIATION visant

Address / Adresse

CHARGE / ACCUSATION

Refer to front page for further counts. / Reportez-vous à la première page pour plus de chefs.

| FOR ADMINISTRATIVE PURPOSES ONLY À DES FINS ADMINISTRATIVES SEULEMENT | | |
|---|---|---|
| ☐ Summons / Sommation | ☐ Show Cause / Audience de justification | ☐ Warrant 1st / Mandat en 1re instance |
| ☐ Replacement Information / Dénonciation de remplacement | | |
| ☐ Reportable M.V. Offence (H.T.A. 199) / Infraction V.A. à déclarer (Code de la route 199) | ☐ C.V.O.R. No (Commercial Vehicles Only) / Numéro C.I.U.V.U. (véhicules utilitaires seulement) | |

| Sex / Sexe M / F | Birth Date / Date de naissance | | | Was defendant owner? La partie défenderesse était-elle propriétaire? | Involves a Collision Infraction reliée à un accident |
|---|---|---|---|---|---|
| | Day / Jour | Month / Mois | Year / Année | | |
| | | | | ☐ Yes/Oui ☐ No/Non | |

Driver's Licence Number / Numéro du permis de conduire

Plate No. / Numéro de plaque ☐

Informant / Dénonciateur

Date Sworn/Affirmed / Déclaré sous serment/affirmé solennellement le

Date of Arrest / Date de l'arrestation

☐ Deemed to be sworn/affirmed / Réputée être déclarée sous serment/affirmée solennellement le

Officer / Agent de police

No. / N°

Police Agency / Service de police

Div. / Dist.

Occurrence Number / N° d'incident

Courtroom / Salle d'audience

At / À(au)

CERTIFIED TO BE A TRUE AND CORRECT
COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFIÉE ET
CONFORME À L'ORIGINAL
DATE ____ 7/12/22

CLERK OF THE COURT / GREFFIER DE LA COUR
ONTARIO COURT OF JUSTICE
COUR DE JUSTICE DE L'ONTARIO

MILLER_Ext_0075

THIS IS EXHIBIT **"B"**  TO THE AFFIDAVIT OF

_____Andrew Hotke_____ SWORN BEFORE ME

THIS  **6th**  DAY OF June, 2022

_____

A COMMISSIONER, ETC.

Kevin Rawluk
LSO 66060D

DURHAM REGIONAL POLICE SERVICE
OCC#:21-185821

Police Case ID: 203047

## WARRANT FOR ARREST WITH OPTIONAL AUTHORIZATION TO ENTER A DWELLING-HOUSE
### *MANDAT D'ARRESTATION AVEC AUTORISATION FACULTATIVE D'ENTRER DANS UNE MAISON D'HABITATION*

CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

Form / *Formule* 7
Sections / *Articles* 475, 493, 597, 800, and / *et* 803
of the *Criminal Code* / *du Code criminel*

CENTRAL EAST
(Region / *Région*)

To the peace officers in the Region and in the Province of Ontario:
*Aux agents de la paix dans ladite région et dans la province de l'Ontario :*

21-A36664
Case/File No. / *N° du cas/dossier*

This warrant is issued for the arrest of   MILLER, Jimmy          09 Nov 2000
*Le présent mandat est délivré pour l'arrestation de*          (name / *nom*)          (date of birth / *date de naissance*)

of the _____ of _____
*du (de la)*          *de*

in the REGION          of          DURHAM          , referred to in this warrant as the accused.
*dans le(la)*          *de*          *ci-après appelé(e) le prévenu.*

**BECAUSE** the accused has been charged with / *ATTENDU QUE le prévenu a été inculpé d'avoir,*

**COUNT 1**
between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, in committing a sexual assault on M▮ A▮▮, use a weapon, namely a knife, contrary to Section 272, subsection (1), clause (a) of the Criminal Code of Canada.

(see Appendix "A" attached)

**AND BECAUSE** (check those that are applicable):
*ET ATTENDU (cocher uniquement ce qui s'applique) :*

☑ (a) there are reasonable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused (507(4), 512(1));
*qu'il y a des motifs raisonnables de croire qu'il est nécessaire dans l'intérêt public de délivrer le présent mandat pour l'arrestation du prévenu (507(4), 512(1));*

☐ (b) the accused failed to attend court in accordance with the summons served on the accused (512(2));
*que le prévenu a omis d'être présent au tribunal en conformité avec la sommation qui lui a été signifiée (512(2));*

☐ (c) (an appearance notice *or* undertaking) was confirmed and the accused failed to attend court in accordance with it (512(2));
*qu'une (citation à comparaître ou promesse) a été confirmée et que le prévenu a omis d'être présent au tribunal en conformité avec ce document (512(2));*

☐ (d) it appears that a summons cannot be served because the accused is evading service (512(2));
*qu'il paraît qu'une sommation ne peut être signifiée du fait que le prévenu se soustrait à la signification (512(2));*

☐ (e) the accused was ordered to be present at the hearing of an application for a review of an order made by a justice and did not attend the hearing (520(5), 521(5));
*qu'il a été ordonné au prévenu d'être présent à l'audition d'une demande de révision d'une ordonnance rendue par un juge de paix et que le prévenu n'était pas présent à l'audition (520(5), 521(5));*

☐ (f) there are reasonable grounds to believe that the accused has contravened or is about to contravene the (summons *or* appearance notice *or* undertaking *or* release order) on which the accused was released (512.3);
*qu'il y a des motifs raisonnables de croire que le prévenu a violé ou est sur le point de violer une (sommation ou citation à comparaître ou promesse ou ordonnance de mise en liberté) aux termes de laquelle il a été mis en liberté (512.3);*

☐ (g) there are reasonable grounds to believe that the accused has committed an indictable offence since their release from custody on (summons *or* appearance notice *or* undertaking *or* release order) (512.3);
*qu'il y a des motifs raisonnables de croire que, depuis sa mise en liberté aux termes d'une (sommation ou citation à comparaître ou promesse ou ordonnance de mise en liberté), le prévenu a commis un acte criminel (512.3);*

☐ (h) the accused was required by (appearance notice *or* undertaking *or* summons) to attend at a time and place stated in it for the purposes of the *Identification of Criminals Act* and did not appear at that time and place (512.1, 512.2);
*qu'une (citation à comparaître ou promesse ou sommation) exigeait que le prévenu soit présent aux date, heure et lieu indiqués pour l'application de la Loi sur l'identification des criminels et que le prévenu n'a pas comparu aux date, heure et lieu ainsi indiqués (512.1, 512.2);*

CCO-7-475-1 (rev. 12/19) CSD

Generated Date: August 13, 2021 07:28 AM

**MILLER_Ext_0077**

**WARRANT FOR ARREST WITH OPTIONAL AUTHORIZATION TO ENTER A DWELLING-HOUSE**
*MANDAT D'ARRESTATION AVEC AUTORISATION FACULTATIVE D'ENTRER DANS UNE MAISON D'HABITATION*
Form / *Formule* 7
Sections / *Articles* 475, 493, 597, 800, and / *et* 803
of the *Criminal Code* / *du Code criminel*

☐ (i) an indictment has been found against the accused and the accused has not appeared or remained in attendance before the court for their trial (597);
*qu'une mise en accusation a été prononcée contre le prévenu et que le prévenu n'a pas comparu ou n'est pas demeuré présent devant le tribunal pour son procès (597);*

☐ (j) (If none of the above applies, reproduce the provisions of the statute that authorize this warrant.)
*(Pour tout cas qui n'est pas visé ci-dessus, reproduire les dispositions de la loi qui autorisent le mandat.)*

**THEREFORE,** you are ordered, in Her Majesty's name, to immediately arrest the accused and to bring them before
*EN CONSÉQUENCE, il vous est enjoint par les présentes, au nom de Sa Majesté, d'arrêter immédiatement le prévenu et de l'amener devant*

Ontario Court of Justice , to be dealt with according to law.
(state court, judge or justice / *indiquer le tribunal, le juge ou le juge de paix*)   , *pour qu'il soit traité selon la loi*

Signed on this __13th__ day of __AUGUST__ , 20 __21__
*Signé le* __jour de__

at the __CITY__
*à(au)*

of __OSHAWA__
*de*

in the Province of Ontario / *dans la province de l'Ontario*

Louis Bourgon
2021.08.13 10:18:56 -04'00'

(Signature of judge, provincial court judge, justice or clerk of the court / *Signature du juge, du juge de la cour provinciale, du juge de paix ou du greffier du tribunal*)

(Name of the judge, provincial court judge or justice who has issued this warrant / *Nom du juge, du juge de la cour provinciale ou du juge de paix ayant décerné le mandat*)

CCO-7-475-1 (rev. 12/19) CSD

**MILLER_Ext_0078**

WARRANT FOR ARREST WITH OPTIONAL AUTHORIZATION TO ENTER A DWELLING-HOUSE
*MANDAT D'ARRESTATION AVEC AUTORISATION FACULTATIVE D'ENTRER DANS UNE MAISON D'HABITATION*

Form / *Formule* 7
Sections / *Articles* 475, 493, 597, 800, and / *et* 803
of the *Criminal Code* / *du Code criminel*

# AUTHORIZATION TO ENTER A DWELLING-HOUSE
## *AUTORISATION POUR ENTRER DANS UNE MAISON D'HABITATION*

[And where applicable] Because there are reasonable grounds to believe that the accused is or will be present in
*[S'il y a lieu] Attendu qu'il existe des motifs raisonnables de croire que le prévenu se trouve ou se trouvera dans*
(specify dwelling-house / *préciser la maison d'habitation*)

This warrant is also issued to authorize you to enter the dwelling-house for the purpose of arresting or apprehending the accused at any time
*Le présent mandat est également délivré pour vous autoriser à pénétrer dans la maison d'habitation en vue d'arrêter ou d'appréhender le*

between the hour of _____ **M**, on the _____ day of _____ , 20 _____
*prévenu à tout moment entre* _____ *h* _____ *jour de* _____ *an*

and the hour of _____ **M**, on the _____ day of _____ , 20 _____ ,
*et* _____ *h* _____ *jour de* _____ *an*

subject to the condition that you may not enter the dwelling-house unless you have, immediately before entering the dwelling-house, reasonable grounds to believe that the person to be arrested or apprehended is present in the dwelling-house.
*sous réserve de la condition suivante: vous ne pouvez pénétrer dans la maison d'habitation que si, au moment de le faire, vous avez des motifs raisonnables de croire que la personne devant être arrêtée ou appréhendée se trouve dans la maison d'habitation.*

[And where applicable] Because there are reasonable grounds to believe that prior announcement of the entry would ***
*[S'il y a lieu] Attendu qu'il existe des motifs raisonnables de croire que le fait de prévenir avant de pénétrer dans la maison d'habitation :***

    (a)  expose the peace officer or any other person to imminent bodily harm or death;
          *exposerait l'agent de la paix ou toute autre personne à des lésions corporelles imminentes ou à la mort;*

                or / *ou*

    (b)  result in the imminent loss or imminent destruction of evidence relating to the commission of an indictable offence.
          *entraînerait la perte ou la destruction imminente d'éléments de preuve relatifs à la perpétration d'un acte criminel.*

This warrant is also issued to authorize you to enter the dwelling-house without prior announcement, subject to the condition that you may not enter the dwelling-house without prior announcement unless you have, immediately before entering the dwelling-house, ***
*Le présent mandat est également décerné pour vous autoriser à entrer dans la maison d'habitation sans prévenir. Toutefois, vous n'avez pas le droit d'entrer dans la maison d'habitation sans prévenir à moins d'avoir, immédiatement avant d'y entrer, ***

    (a)  reasonable grounds to suspect that prior announcement of the entry would expose the peace officer or any other person to imminent bodily harm or death
          *des motifs raisonnables de soupçonner que le fait de prévenir de l'entrée dans la maison d'habitation exposerait l'agent de la paix ou toute autre personne à des lésions corporelles imminentes ou à la mort;*

                or / *ou*

    (b)  reasonable grounds to believe that prior announcement of the entry would result in the imminent loss or imminent destruction of evidence relating to the commission of an indictable offence.
          *des motifs raisonnables de croire que le fait de prévenir avant de pénétrer dans la maison d'habitation entraînerait la perte ou la destruction imminente d'éléments de preuve relatifs à la perpétration d'un acte criminel.*

The authorization to enter the dwelling-house for the purpose of arresting or apprehending the accused shall be carried out in accordance with following terms and conditions: / *L'autorisation d'entrer dans la maison d'habitation dans le but d'arrêter ou d'appréhender le prévenu sera exécutée conformément aux conditions suivantes :*
(conditions to be specified / *conditions à préciser*)

Signed on _____ day of _____ , 20 _____
*Signé le* _____ *jour de* _____

at the _____
*à(au)* _____

of _____
*de* _____

in the Province of Ontario / *dans la province de l'Ontario*

_____
(Signature of judge, provincial court judge, justice or clerk of the court / *Signature du juge, du juge de la cour provinciale, du juge de paix ou du greffier du tribunal*)

_____
(Name of the judge, provincial court judge or justice who has issued this warrant / *Nom du juge, du juge de la cour provinciale ou du juge de paix ayant décerné le mandat*)

***Choose applicable recital. / *Choisir l'attendu qui s'applique.*

CCO-7-475-1 (rev. 12/19) CSD

MILLER_Ext_0079

Form / *Formule 28*
Section / *Article 528*
of the *Criminal Code / du Code criminel*

# ENDORSEMENT OF WARRANT
## *VISA DU MANDAT*

CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

_____
(Region / *Région*)

In accordance with the application this day made to me, I authorize the arrest of the accused (or defendant)

*Conformément à la demande qui m'a été adressée ce jour, j'autorise par les présentes l'arrestation du prévenu (ou du défendeur)*

within the _____
*dans la* _____
(Region / *Région*)

Dated this _____ , 20 ____
*Fait le*           day of
                    *jour de*

at the _____
*à(au)*          of
                 *de*

in the Province of Ontario / *dans la province de l'Ontario*

_____
Signature of Justice / *Signature du juge de paix*

---

Form / *Formule 29*
Section / *Article 499 and / et*
subsection / *paragraphe 507(6)*
of the *Criminal Code / du Code criminel*

# ENDORSEMENT OF WARRANT
## *VISA DU MANDAT*

CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

_____
(Region / *Région*)

Whereas this warrant is issued in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 thereof.

*Attendu que le présent mandat est décerné relativement à une infraction autre qu'une infraction mentionnée à l'article 522 du Code criminel, j'autorise par les présentes la mise en liberté du prévenu conformément à l'article 499 mentionné ci-dessus.*

Dated this _____ , 20 ____
*Fait le*           day of
                    *jour de*

at the _____
*à(au)*          of
                 *de*

in the Province of Ontario / *dans la province de l'Ontario*

_____
Judge, or Justice of the Peace / *Juge ou juge de paix*

CCQ-7-475-1 (rev. 12/19) CSD

MILLER_Ext_0080

Appendix "A"                                                           Page 1
(MILLER, Jimmy )

**COUNT 2 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, with a part of his body, for a sexual purpose, directly or indirectly touch the body of a person under the age of sixteen years, namely Ma█ A█████ contrary to Section 151 of the Criminal Code of Canada.

**COUNT 3 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did commit a sexual assault on M█ A█ contrary to Section 271 of the Criminal Code of Canada.

**COUNT 4 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, with a part of his body, for a sexual purpose, directly or indirectly touch the body of a person under the age of sixteen years, namely M█████ A█████ contrary to Section 151 of the Criminal Code of Canada.

**COUNT 5 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did commit a sexual assault on G█████ A█████ contrary to Section 271 of the Criminal Code of Canada.

**COUNT 6 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, with a part of his body, for a sexual purpose, directly or indirectly touch the body of a person under the age of sixteen years, namely G█ A█████ contrary to Section 151 of the Criminal Code of Canada.

**COUNT 7 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did commit a sexual assault on G█████ A█ contrary to Section 271 of the Criminal Code of Canada.

**COUNT 8 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, with a part of his body, for a sexual purpose, directly or indirectly touch the body of a person under the age of sixteen years, namely G█████ A█████ contrary to Section 151 of the Criminal Code of Canada.

**COUNT 9 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, by word of mouth, knowingly utter a threat to cause death to M████ A█████ contrary to Section 264.1, subsection (1), clause (a) of the Criminal Code of Canada.

**COUNT 10 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at the Town of Whitby in the Central East Region did, for a sexual purpose, counsel, a person under the age of sixteen years, namely M████ A██████ to directly or indirectly touch with a part of his body and touch the body of Ga█████ A█████ contrary to Section 152 of the Criminal Code of Canada.

Appendix "A"                                                                    Page 2
(MILLER, Jimmy )

**COUNT 11 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at
the Town of Whitby in the Central East Region did, for a sexual purpose, counsel, a person
under the age of sixteen years, namely G▮▮▮▮ A▮▮▮▮ to directly or indirectly touch with a
part of his body and touch the body of M▮▮ A▮▮▮ contrary to Section 152 of the Criminal
Code of Canada.

**COUNT 12 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at
the Town of Whitby in the Central East Region did possess a weapon, namely a knife, for the
purpose of committing an offence, contrary to Section 88, subsection (1) of the Criminal Code
of Canada.

**COUNT 13 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at
the Town of Whitby in the Central East Region did possess a weapon, namely a BB gun, for the
purpose of committing an offence, contrary to Section 88, subsection (1) of the Criminal Code
of Canada.

**COUNT 14 AND FURTHER THAT**
Between the 31st day of March in the year 2021 and the 8th day of August in the year 2021 at
the Town of Whitby in the Central East Region did use an imitation firearm, namely an
imitation a BB gun, while committing an indictable offence under Section 152 of the Criminal
Code, contrary to Section 85, subsection (2), clause (a) of the Criminal Code of Canada.

| CANADA | ) | HER MAJESTY THE QUEEN |
| | ) | |
| PROVINCE OF ONTARIO | ) | v. |
| | ) | |
| CENTRAL EAST REGION | ) | Jimmy MILLER |

IN THE MATTER of a request by Canada for the extradition of Jimmy MILLER from the United States of America with respect to offences under the *Criminal Code* of Canada.

## AFFIDAVIT OF DET. CST. KAVANAGH

**I, JENNIFER KAVANAGH,** of the City of Oshawa, in the Province of Ontario, Canada, **MAKE OATH AND SAY AS FOLLOWS:**

### A.    INTRODUCTION

1.     I am a Detective Constable with the Durham Regional Police Service (DRPS) and have been a police officer with the Service since December 2005. I am the primary investigating officer in respect of this matter. I am currently assigned to the Special Victims Unit. My normal duties include investigating sexual assaults and assaults against children.

2.     I have 16 years of police experience and I have worked on patrol as a member of the Community Resource Unit on the Community Response Team and as a School Liaison Officer.

3.     I became involved in this investigation on August 10, 2021 and continue to be involved to date. As the lead investigator, I am very familiar with this case and have personal knowledge of the matters referred to herein. I have personal knowledge except where I have indicated that my knowledge is based on information and belief, in which case I now confirm that I believe such information to be true.

### B.    THE CHARGES

4.     Canada is seeking the extradition of Jimmy MILLER (MILLER) in relation to the following charges:

- Sexual assault with a weapon, contrary to section 272(1)(a) of the *Criminal Code* of Canada;

1

- Sexual interference (four counts), contrary to section 151 of the *Criminal Code* of Canada;

- Uttering threats, contrary to section 264.1(1)(a) of the *Criminal Code* of Canada;

- Sexual assault (three counts), contrary to section 271 of the *Criminal Code* of Canada;

- Invitation to sexual touching (two counts), contrary to section 152 of the *Criminal Code* of Canada;

- Possession of weapon for the purpose of committing an offence (two counts), contrary to section 88(1) of the *Criminal Code* of Canada; and

- Using imitation firearm in commission of an offence, contrary to section 85(2) the *Criminal Code* of Canada.

5.      These offences are believed to have been committed between March 31, 2021 and August 8, 2021 in the Town of Whitby, Ontario, Canada. The alleged offences were committed against two male victims who were both under the age of 16 at the time of the incidents. The victims and their family will be referred to by their initials to protect their identities.

6.      On August 13, 2021, an Information was sworn by Special Constable Elizabeth Pennington before the Honourable Justice of the Peace L. Bourgon of the Ontario Court of Justice, Oshawa, Ontario, charging MILLER with one count of sexual assault with a weapon, four counts of sexual interference, one count of uttering threats, three counts of sexual assault, two counts of invitation to sexual touching, two counts of possession of a weapon for the purpose of committing an offence, and one count of using an imitation firearm in the commission of an offence. That same day, a Warrant for the Arrest of MILLER was issued by the Honourable Justice of the Peace L. Bourgon of the Ontario Court of Justice, Oshawa, Ontario. The arrest warrant is presently outstanding in respect of the charges contained in the aforementioned Information.

**C.      SUMMARY OF ALLEGED OFFENCES**

7.      The alleged victims in this matter, M.A. (DOB 2011-May-14) and G.A. (DOB 2017-Jan-12) are brothers. The accused is their maternal half-brother.

2

*Initial Police Report and Interview with A.A.*

8.     On August 9, 2021, the victims' mother, A.A., and father, E.A., filed an initial police report with Police Constable JIGGINS of the DRPS, alleging that MILLER had touched himself while next to M.A. and had sexually assaulted G.A.

9.     On August 10, 2021, I spoke with A.A. and she advised that after the initial report, she received further information from the victims regarding the alleged offences. I conducted an interview with A.A. this same day.

10.    A.A. said she recently had a suspicion that MILLER was hitting M.A. and G.A. She noted that this suspicion was based only on a feeling and was not supported by anything concrete that she had observed. A.A. said she asked M.A. about this repeatedly, but he denied that MILLER was hitting them. A.A. advised that on August 7, 2021, M.A. went to the movies with MILLER, and after this outing, she asked M.A. if something was wrong. M.A. eventually told her that MILLER made him uncomfortable at the movies by talking about his "balls" hurting.

11.    After further questioning, M.A. told A.A. that MILLER had been touching himself while naked and under the blankets in bed, while M.A. was lying next to him. After hearing this, A.A. asked her 19-year-old daughter, S.A., to come over to the house, and A.A. and S.A. confronted MILLER about the allegations while M.A. was present. According to A.A., MILLER became angry during this confrontation, denied the allegations, and said that M.A. was destroying the family. A.A. then told MILLER he had to leave the house, and the accused packed some belongings and left.

12.    A.A. said that later that same day (August 7, 2021), she questioned M.A. again, because she felt there was more that he was not telling her. However, M.A. did not disclose any further information at this time.

13.    A.A. advised that on the morning of August 8, 2021, she asked G.A. if MILLER ever touched him inappropriately in his "bila", which is the term they use to refer to penis. G.A. said yes, pulled out his penis, and showed A.A. how MILLER would touch it. G.A. also told her that MILLER put his finger and his tongue in G.A.'s "bum". G.A. said this occurred close to ten times. A.A. and her husband, E.A., reported this information to police on August 9, 2021.

3

14.     Following the initial police report, at approximately 2:00 a.m. on August 10, 2021, A.A. said she questioned M.A. again about his interactions with MILLER, and M.A. denied that anything else had happened. However, when A.A. spoke to G.A. again, G.A. told her that M.A. had put his "bila" (penis) in G.A.'s "bum". After this disclosure, M.A. eventually admitted that MILLER would make him and G.A. play with each other's penises. M.A. admitted to putting his penis in G.A.'s anus and noted that MILLER watched this occur. M.A. advised that MILLER would hold a knife to M.A.'s neck and would hold G.A. down and force himself on G.A. and would do this to M.A. M.A. also said that MILLER would threaten him and his brother, telling them that if they did not do what he demanded, he would kill them, or their dad or mom, destroy the family, and burn down the house. M.A. told A.A. that he did not disclose the incidents to her because of these threats.

15.     A.A. said she asked M.A. when the incidents with MILLER began, and M.A. advised that it only happened in their new house. A.A. clarified that the family moved into their new house on March 31, 2021. A.A. did not know when the most recent incident occurred.

16.     A.A. said that S.A. spoke to MILLER on August 9, 2021. MILLER told S.A. that he was not going to the music studio, where he records music, and was instead going to get employment insurance and go where nobody would find him.

***Interview with M.A.***

17.     On August 10, 2021, I conducted an interview with M.A. He said there was an incident where he was in bed with MILLER, and while he was trying to sleep, MILLER was "playing with himself" in the bed beside him.

18.     M.A. advised that MILLER threatened to kill him and his brother if they told anyone about the incidents or if they did not do what he wanted. M.A. further stated that MILLER held a knife to his neck. The first incident that occurred was one month after moving into their new house. M.A. said he believed they had been living in their new house for approximately one year, and he confirmed that the alleged incidents only occurred at this new home.

19.     M.A. advised that the first incident that occurred was in the game room on the third floor of their house. He said that MILLER had a knife and "asked if he could play with [M.A.]". M.A. clarified that MILLER meant he wanted to touch M.A.'s private parts. M.A. said that MILLER touched his penis, and he demonstrated this action to me by motioning a back-and-forth hand

4

movement. M.A. said that this touch was initially over his clothes and was then under his clothes, and following this, MILLER pulled M.A.'s pants down and told him to stand up and turn around. M.A. advised that MILLER then put his penis in M.A.'s anus. MILLER threatened M.A., saying, "don't tell mom or I'll kill you", and held a knife to his neck while this assault occurred. M.A. said he was very scared. He advised that after this incident, his "tummy" and "bum" hurt, and the next day, when he went to "poo", he saw blood.

20.     M.A. said that later that same day, he went up to the third floor and saw MILLER playing with G.A.'s "front private". He heard MILLER tell G.A. to stand up, and he saw MILLER put his penis in G.A.'s anus. He said he also heard MILLER tell G.A. not to tell their mom what had happened. During this interview, M.A. said he did not think that MILLER or G.A. knew he had witnessed this incident.

21.     M.A. said that MILLER has also threatened him and his brother by holding a BB gun to their heads. He said that after the first assault, M.A. was assaulted again approximately two days later. M.A. said that MILLER would wait until he and his brother were home alone before assaulting them.

22.     M.A. stated that MILLER assaulted him approximately 6-7 times, MILLER would touch M.A.'s penis and then proceed to penetrate M.A.'s anus with his penis. M.A. said he only saw MILLER assault G.A. the one time. M.A. said he never told anyone about the assaults until he told his mom. He believed the last assault occurred approximately one month ago.

*Interview with G.A.*

23.     On August 10, 2021, I also conducted an interview with G.A., who said that MILLER had touched his "abuda" (he pointed to his groin as he said this).  G.A. advised of an incident happened in his dad's bed.  He was laying down.  MILLER used his hand to touch him.  M.A. was also present and his dad, who was sleeping in the bed. G.A. said he did not touch MILLER. Due to G.A.'s young age (four years old at the time of the interview), he was unable to provide further details or context when asked further questions about the incident.

*Second Interview with M.A.*

24.     There was a short break between interviews with the two victims. I was advised by A.A. that during this break, M.A. told her that he had not disclosed one of the incidents in his

5

interview, which involved MILLER making him put his penis in G.A.'s anus, because he had been embarrassed and afraid of getting into trouble.

25.     I conducted a second interview with M.A. on August 10, 2021, and he reported that on the day that he witnessed MILLER assaulting G.A., MILLER did see him come up the stairs. M.A. advised that when MILLER saw him, MILLER pointed a BB gun at him and forced him to touch G.A.'s penis. MILLER also forced G.A. to touch M.A.'s penis. M.A. said that MILLER then forced him to put his penis in G.A.'s anus, and that MILLER held the BB gun to the back of his head throughout this incident. M.A. advised that he did not disclose this incident during his first interview because he felt uncomfortable.

26.     On August 11, 2021 A.A. advised me that she and her husband had looked for the BB gun last night (not under my direction) and had not been able to locate it.

***Forensic Testing***

27.     Anal swabs of both M.A. and G.A. were taken at the Lakeridge Health Oshawa Domestic Violence and Sexual Assault Care Centre as part of the Sexual Assault Evidence Kit and were accepted by the Centre of Forensic Sciences. The swabs were taken August 10, 2021 – days after the incidents came to light. The swabs were sent for delivery to CFS on September 3, 2021. The CFS Biology Report came back on November 23, 2021, indicating that only DNA from M.A. was identified on the anal swab taken from M.A. and only DNA from G.A. was identified on the anal swab taken from G.A.

## D.     IDENTIFICATION OF THE ACCUSED

28.     The accused in this matter is Jimmy MILLER, born on November 9, 2000. He is a dual citizen of both the United States and Canada. This information was confirmed by US Marshal BOLDIN as well as the accused's mother, A.A. MILLER does not have a criminal record in Canada.

29.     Attached hereto and marked as **Exhibit "A"** to this affidavit is a photograph of Jimmy MILLER.  This photograph was obtained, on August 12, 2021, from the Ministry of Transportation Ontario and was taken on November 7, 2020 for drivers licence purposes.

30.     This photo was confirmed to be Jimmy MILLER by his mother, A.A. on May 16, 2022 via email.

### E.   CURRENT LOCATION

31.    On August 12, 2021, I was advised by Officer CLARK #CAR11599 of U.S. Customs and Border Protection that MILLER had crossed the border into the United States at 10:44 a.m. on August 10, 2021 as a pedestrian, and was alone. During this crossing, MILLER provided a photocopy of his Canadian passport, and because he was born in Cleveland, Ohio, he was granted entrance into the United States.

32.    On May 9, 2022, I was advised by US Marshal BOLDIN that MILLER had been observed at 5856 Brecksville Rd, Independence, OH, on this date.

### F.   CONCLUSION

33.    Based on the foregoing, I have reasonable and probable grounds to believe, and I do believe, that Jimmy MILLER committed the offences listed at para. 4 above.

34.    I make this affidavit in support of Canada's request for the extradition of Jimmy MILLER so that he may be tried for the offences with which he has been charged and for no improper purpose or motive.

SWORN BEFORE ME at the           )
City of Oshawa, in the Province of  )
Ontario, Canada, this  6  day      )
of  June          , 2022.          )

DC Jennifer KAVANAGH #3363

_____ #1962

~~Barrister & Solicitor~~
& Commissioner of Oaths

Cindy Lynn O'Connell, a Commissioner,
etc., Province of Ontario, for
Durham Regional Police Service.
Expires June 15, 2024.

7

HER MAJESTY THE QUEEN

v.

Jimmy MILLER


**IN THE MATTER** of a request by Canada for the extradition of Jimmy MILLER from the United States of America with respect to offences under the *Criminal Code* of Canada.


**AFFIDAVIT OF DET. CST. KAVANAGH**

8

THIS IS EXHIBIT **"A"** TO THE AFFIDAVIT OF

<u>Det. Cst. Jennifer Kavanagh</u>  SWORN BEFORE ME

THIS **6th** DAY OF June, 2022

_____ # 1962
A COMMISSIONER, ETC.

Cindy Lynn O'Connell, a Commissioner,
etc., Province of Ontario, for
Durham Regional Police Service.
Expires June 15, 2024.

MILLER_Ext_0091



MILLER_Ext_0092